Richard ROWE et al., Plaintiffs,

v.

UNITED STATES of America et al., Defendants.

John T. ROWLETT et al., Plaintiffs,

v.

UNITED STATES of America et al., Defendants.

Nos. A76–280 Civil, A76–283 Civil.

United States District Court,
D. Alaska.

Jan. 5, 1979.

As Amended Feb. 23, 1979.

Robert L. Hartig, J. Michael Robbins, Cole, Hartig, Rhodes, Norman & Mahoney, Anchorage, Alaska, for plaintiff Rowe.

W. C. Arnold, R. Eldridge Hicks, Ruskin, Barker & Hicks, Anchorage, Alaska, for plaintiff Rowlett.

Alexander O. Bryner, U. S. Atty., Anchorage, Alaska, Cynthia L. Pickering, Land and Natural Resources Div., Dept. of Justice, Anchorage, Alaska, James E. Brookshire, Land and Natural Resources Div., Dept. of Justice, Washington, D. C., for defendant United States of America.

Kevin F. Kelly, Wickwire, Lewis, Goldmark, Dystel & Schorr, Seattle, Wash., Stephan E. DeLisio, Merdes, Schaible, Staley & DeLisio, Anchorage, Alaska, for defendant Arctic Slope Regional Corp.

## MEMORANDUM OPINION AND ORDER

FITZGERALD, District Judge.

These two cases, now before the court on cross-motions for summary judgment, manifest a continuing effort by plaintiffs to secure oil and gas leases on the North Slope of Alaska.[1] Plaintiffs are unsuccessful applicants for federal oil and gas leases filed under provisions of the Mineral Leasing Act of 1920.[2] The defendants are the United States, the Secretary of the Department of the Interior,[3] and the Arctic Slope Regional Corporation,[4] one of twelve Native corporations established by Act of Congress in the Alaska Native Claims Settlement Act of 1971.[5] In large part, plaintiffs seek judicial

[1] See, e. g. *Burglin v. Morton*, 527 F.2d 486 (9th Cir. 1975), *cert. denied*, 425 U.S. 973, 96 S.Ct. 2171, 48 L.Ed.2d 796 (1976); *Burglin v. Kleppe*, Nos. A75–113, A75–232 (D.Ak. Dec. 29, 1976), *affirmed by mem. op.* 582 F.2d 1289 (9th Cir. 1978); *Rowe v. Kleppe*, No. 75–1152 (D.D.C. July 29, 1976).

[2] 30 U.S.C. § 181 *et seq.* (hereinafter "Mineral Leasing Act"). Plaintiffs' lease applications comprise a total acreage in excess of 1,000,000 acres.

[3] Hereinafter "the Secretary".

[4] Hereinafter "Regional Corporation".

[5] 43 U.S.C. § 1601 *et seq.* (hereinafter ANCSA). In settlement of aboriginal claims the Act provides for Native selection of 40,000,000 acres of federal land, and a monetary award of $1,000,-000,000.

review of the Secretary's rulings [6] upholding certain land selections and subsequent conveyances made to defendant Regional Corporation pursuant to the Settlement Act. These conveyances, plaintiffs claim, should be made subject to oil and gas leases to which plaintiffs are entitled.[7] A review of the history of Alaska Native land claims, and their relationship to the mining laws applicable to Alaska, serves to put the issues in perspective.

## I. HISTORY OF THE CASE

Alaska Native land claims extend back in time to the Treaty of Cession of March 30, 1867; however, they were not directly addressed by Congress until passage of the Settlement Act in 1971. Although an earlier opinion of this Court traces this history in considerable detail,[8] it bears repeating that when the Mineral Leasing Act was passed in 1920, no provision was included respecting Alaska Native use or occupancy. The first significant statute providing for conveyance of lands to Natives in Alaska, then under territorial status, merely provided procedures whereby Natives might acquire patents to lots within Native townsites.[9]

For a number of reasons, no treaties were ever executed between the United States and Alaska Native groups either designating reservation lands for Native occupation, or defining Native fish and game rights; and although seven reservations were created by the Secretary, and other lands withdrawn by various Executive Orders for the benefit of certain Native groups, these actions did not affect the Native groups inhabiting the North Slope.[10]

The situation of the North Slope Natives remained largely unchanged until passage of the Alaska Statehood Act in 1958.[11] Congress provided in the Statehood Act that Alaska in making its selection of 102,500,000 acres, "disclaim all right and title . . . to any lands or other property (including fishing rights), the right or title to which may be held by any Indians, Eskimos, or Aleuts . . . or is held by the United States in trust for said [N]atives." The Act went on to declare that such "lands or other property" would remain within the absolute jurisdiction and control of the United States "until disposed of under its authority, except to such extent as the Congress had prescribed or may hereafter prescribe . . . ."[12] As a result, Native rights were untouched by the Statehood Act.

It was the intent of Congress in the Statehood Act to provide the new state with a solid economic foundation.[13] It is therefore not surprising that in addition to the grant of 102,500,000 acres of land, the State of Alaska was granted 90 percent of the revenues received by the United States from coal and mineral leases situated on

---

**6.** *In re Arctic Slope/Western*, ANCAB No. RLS 76–11(A)–(MM); *In re Arctic Slope/Eastern (Central)*, ANCAB No. RLS 76–12(A)–(O) (hereinafter *Arctic Slope*).

**7.** Plaintiffs also allege claims based upon, (1) breach of contract in the failure of the Secretary to execute leases; (2) procedural and substantive due process claims arising out of the Secretary's "land freeze" suspending any disposition of federal lands; (3) a procedural due process claim arising out of the Secretary's assumption of original jurisdiction over plaintiffs' appeals pending before the Alaska Native Claims Appeal Board, and; (4) a suit to quiet title to the lands in question.

**8.** *U. S., Inupiat Community of the Arctic Slope v. Atlantic Richfield Company, 435 F.Supp. 1005 (D.Ak. June 3, 1977). Similarly fn. 10, 43.*

**9.** Act of May 25, 1926, Ch. 379, § 1, 44 Stat. 629, 43 U.S.C. § 733. This program permitted townsites to be established through the supervision of a townsite trustee. After a subdivisional survey was drawn, patent to occupied lots was transferred to the occupants.

**10.** *See generally, Inupiat Community, supra* at 5–7.

**11.** Act of July 7, 1958, Pub.L. No. 85–508, 72 Stat. 339, *as amended*, 73 Stat. 141, 48 U.S.C. Prec. § 21 note (hereinafter Statehood Act).

**12.** *Id.* at Section 4.

**13.** H.R.Rep. No. 624, 85th Cong., 2d Sess. pp. 1–2 (June 25, 1957), 1958 U.S.Code Cong. & Admin.News, p. 2933.

Alaskan lands retained by the federal government.[14]

Given this policy of the federal government regarding the disposition of Alaskan lands, it is also not surprising that in the same year as passage of the Statehood Act, the Secretary issued Public Land Order 1621[15] opening large sections of federally-owned North Slope lands to mineral exploration by private individuals through issuance of oil and gas leases under the Mineral Leasing Act.[16]

The 1958 lease opening of PLO 1621 amounted to a general release of the lands described. Before designated tracts might be opened to leasing, it was necessary to prepare, approve and file leasing maps and to publish a notice of availability in the Federal Register.[17]

By early 1964 only two areas had had the proper protraction maps drawn up and filed. Leases were issued for those lands.[18] At that time protraction maps existed for

the balance of the opened lands, but the Secretary had not yet caused them to be filed. However, the Department did have detailed plans underway to lease approximately 16–18 million acres located between the two areas already leased. This was to be accomplished in four separate openings.[19] It is the fourth and last of these openings that is the subject of controversy in these two cases.

An analysis of the essential features of the Mineral Leasing Act as it existed in 1966 is appropriate at this time. Section 226 of the Act grants discretionary authority to the Secretary to issue oil and gas leases on federal lands. Subsection (c), the provision applicable to these cases, concerns the leasing of lands "not within any known geological structure of a producing oil or gas field" and provides that such leasing may occur without competitive bidding, on a priority-in-time basis.[20]

14. Statehood Act, *supra* note 11, Section 28.

15. PLO 1621, 23 Fed.Reg. 2637 (April 22, 1958). Prior to PLO 1621 these lands had been reserved in connection with the prosecution of World War II. The lands opened to leasing by PLO 1621 were all those lands (except Naval Petroleum Reserve No. 4 and the pending Arctic Wildlife Range) lying north of the crest of the Brooks Range and the DeLong Mountains, from the United States-Canada border to Cape Lisburne and the Arctic Ocean.

16. Prior to this "opening" there had been leasing in Alaska, although largely confined to the Kenai Peninsula. However, some leasing activity did involve lands within the northern half of Alaska, deemed by the Department to be within its Fairbanks Land District. Lands in the Kateel River area were filed on in August, 1954. Lands in the Kuskokwim area were filed on in 1958. Daniel A. Jones, Manager, Fairbanks Land Office, *Oil and Gas Leasing on the North Slope, Alaska* (Mar. 20, 1964) (paper presented at the Seventh Annual Mining, Minerals and Petroleum Conference at College, Alaska) at 5.

17. PLO 1621, ¶ 4, note 15 *supra*.

18. The two areas comprised 3.4 million acres and were opened to noncompetitive leasing on July 1, 1958. A simultaneous drawing was held on October, 1958, and ultimately less than half was leased. By the mid-1960's nearly all of the acreage had been leased.

19. The acreages to be leased were: (I) 3,600,-000; (II) 4,775,000; (III) 6,995,000; (IV) 4,865,-000. *See* paper by Jones at p. 10, cited note 16, *supra*. The Department did subsequently open these lands to lease offers in 30 Fed.Reg. 898 (Jan. 28, 1965); 30 Fed.Reg. 11697 (Sept. 11, 1965); 31 Fed.Reg. 4741 (March 19, 1966); and 31 Fed.Reg. 12575 (Sept. 23, 1966). The general release of North Slope lands, PLO 1621, was amended in 1965 to reflect this particular set of openings and the leasing procedures which would be followed as portions of the 16,000,000 acres became available. PLO 3521, 30 Fed. Reg. 271 (Jan. 9, 1965). Plaintiffs have referred to this program as the "special North Slope noncompetitive leasing program."

20. 30 U.S.C. § 226(a)–(c) provides in part:

(a) All lands subject to disposition under this chapter which are known or believed to contain oil or gas deposits may be leased by the Secretary.

(b) If the lands to be leased are within any known geological structure of a producing oil or gas field, they shall be leased to the highest responsible qualified bidder by competitive bidding under general regulations . . .

(c) If the lands to be leased are not within any known geological structure of a producing oil or gas field, the person first making application for the lease who is qualified to hold a lease under this chapter shall be entitled to a lease of such lands without competitive bidding. Such leases shall be condi-

Two procedures were devised for the non-competitive leasing of § 226(c) federal lands. Under the first, or "simultaneous filing" method, lease applicants filed offers pursuant to a notice from the Secretary that lands were available for leasing. This was the procedure followed by the plaintiffs in *Rowe.* On a designated date, the Secretary would hold a drawing to determine the "successful drawee," as between several lease applicants for a particular block of acreage. Once so determined, the successful drawee became the first qualified applicant or offeror for a particular lease.[21]

The second or noncompetitive leasing method (involving the *Rowlett* plaintiffs) simply involved the filing of "over-the-counter" lease offers in the designated office of the Bureau of Land Management; the first qualified applicant to file an offer would acquire priority for a lease as against other lease applicants. The Department employed this second method to facilitate

the leasing of two types of land: land for which no lease applications had been received under the "simultaneous filing" method but which remained opened and available, and land for which current lease terms had expired under the mandatory ten-year limitation.

Public Land Order 1621, together with Public Land Order 3521, required that a simultaneous filing period be provided for in the four separate openings previously mentioned. Additionally, the Secretary had promulgated extensive regulations governing the two noncompetitive lease filing procedures.[22]

In September, 1966, the Secretary published the fourth and last notice relating to PLO 3521 lands.[23] The September notice provided that those offers to lease filed between September 26, 1966, and November 18, 1966, would be considered as having been simultaneously filed.[24] Thereafter

tioned upon the payment by the lessee of a royalty of 12½ per centum in amount or value of the production removed or sold from the lease.

**21.** 43 C.F.R. 3123.9(c) (1964).

**22.** The general regulations governing noncompetitive leasing at the time of the 1966 notice of availability may be found at 43 C.F.R. 3120, *et seq.* (1964) as amended. Part 3123.9 governed the "simultaneous filing" program; Part 3123.1 governed the "over-the-counter" filing program. It should be added, however, that provision was made in the Federal Register that the notices would overrule any inconsistent prior regulations. *See* text accompanying note 100, *infra.*

**23.** 31 Fed.Reg. 12575 (Sept. 23, 1966).

**24.** *Id.* The Notice also provided that by signing and submitting the requisite "Special Oil and Gas Drawing Entry Card" the applicant would be bound to a lease "if such a lease [were] issued to him as a result of the drawing." The applicant was further required to include a $10.00 filing fee and the first year's advance rental. This advance rental was returnable, up until the day of the drawing (if an offer was withdrawn) and thereafter if an offer was rejected either during or after the drawing. However, if an applicant became a "successful drawee" for a particular block of land, and his offer was not rejected, the rental was deemed earned and deposited in the U. S. Treasury.

The September notice provided in pertinent part:

(3) On the date the approved leasing maps are officially filed in the Fairbanks District and Land Office, the lands described therein will become available for noncompetitive oil and gas leasing pursuant to the Mineral Leasing Act, . . . the regulations in 43 C.F.R. Part 3120, and the provisions of this notice. The provisions of this notice shall supersede any provisions of the regulations with which they may be in conflict.

.    .    .    .    .

(b) Offers to lease these lands in the manner set out in paragraph (c) may be filed in the Fairbanks District and Land Office of the Bureau of Land Management from 10 a. m. on September 26, 1966, until 4 p. m. on November 18, 1966. Such offers will be considered as having been simultaneously filed.

(c) Offers to lease must be submitted on a "Special Oil and Gas Drawing Entry Card" Form 4–1720, signed by the applicant. The card will constitute the applicant's offer to lease the described block of land by participating in the drawing to determine the successful drawee. By signing and submitting the entry card, the applicant agrees that he will be bound to a lease on Form 4–1158 for the described block if such a lease is issued to him as a result of the drawing. .    .    . The entry card must be accompanied by a $10.00 filing fee and the first year's advance rental for the total area as shown on the appropriate approved leasing map. .    .    .

(d) Upon the determination of the successful drawee for a particular block, the first year's rental will be earned and deposited in

over-the-counter offers to lease would be considered for blocks of lands which did not have outstanding simultaneous offers on the date of the drawing.

The *Rowe* plaintiffs responded to the September notice by filing offers within the simultaneous filing period. The *Rowlett* plaintiffs thereafter filed over-the-counter offers for a number of the remaining blocks. The *Rowlett* plaintiffs apparently also filed over-the-counter offers for lands opened by the three earlier notices,[25] although all the *Rowlett* offers were filed between 1966 and 1969.[26]

Long before the September, 1966 leasing program, Native groups and individuals had voiced protests against State and Federal disposition of lands alleged by the Natives to be subject to claims of aboriginal ownership. Beginning in late 1961 the Bureau of Indian Affairs filed protests on behalf of various Native groups,[27] including protests conflicting with 1,750,000 acres of the State's initial selections. As State selections continued through the 1960's, the filing of individual or village protests mounted steadily. By April, 1968, forty protests, covering some 300,000,000 acres, or 80% of the State, had been filed, with the North Slope Native Association laying claim to virtually the entire North Slope.[28]

The position of the Bureau of Land Management[29] shifted somewhat over these years as the number of protests increased. In 1961 the relevant provision of the Department regulations[30] required only that "lands *occupied* by Indians, Aleuts and Eskimos, in good faith will not be subject to entry or appropriation by others." (Emphasis added.) Protests filed for lands falling beyond the narrow scope of the regulations were thus dismissed. The corresponding position of the Regional Solicitor of the Department was to recognize only protests based upon occupancy ultimately leading to grant of allotments under the Alaska Native Allotment Act. Claims based solely on Indian title were to be dismissed. However, in 1962 appeals from dismissals of Native land claims had reached the office of the Director of the Bureau and beginning in 1963 the Director transferred all Native protests to the central office in Washington, D. C. for consideration.[31]

Despite this increased sensitivity to the mounting Native claims, Interior decided to proceed with the September, 1966 North Slope opening as scheduled. But by this time, Native groups had become so organized that the protests in response to the opening were almost immediate.[32] At this

the U. S. Treasury, and will not be returnable. However, if an offeror withdraws his offer to lease prior to the beginning of the drawing or if his offer is rejected, the advance rental will be returned to him. . . .

(e) Any lands not included in offers to lease filed during the simultaneous filing period, or in offers which are withdrawn before the drawing, will become subject to leasing, as of 10 a. m. on November 21, 1966, in the usual manner on a priority of filing time basis and in accordance with the regulations in 43 C.F.R. 3120. . . .

(f) If a successful drawee is unqualified to receive a lease, the lands in the leasing block shall be included in a special simultaneous filing procedure to be announced at a later date by the Manager, Fairbanks District and Land Office.

.    .    .    .    .

**25.** *See* note 19 *supra.*

**26.** *See Rowlett* complaint at 3. The first-in-time priority of these offers as against subsequent lease offers is set out in 43 C.F.R. Part 3123.(1)(b).

**27.** E. g., Alaska Federation of Natives, North Slope Native Association.

**28.** Federal Field Committee for Development Planning in Alaska, Alaska Natives and the Land, at 440, 456–459 (1968).

**29.** Hereinafter "Bureau."

**30.** 43 C.F.R. 2013.9.3.

**31.** *See* note 28 *supra.*

**32.** Suit was brought in Federal District Court by the Arctic Slope Native Association (defendant ASRC's predecessor) on October 4, 1966, for a permanent injunction against the leasing. *Inupiat Eskimos v. Bureau of Land Management,* Civ. No. F26–66 (D.Ak.1966). On plaintiff's motion, the action was dismissed without prejudice three weeks later. Plaintiff revealed in his moving papers that negotiations with the Department were proceeding at that time.

juncture Secretary Udall determined that further leasing activity on the questioned North Slope lands should be temporarily brought to a halt.

By memorandum dated October 13, 1966, the Regional Solicitor instructed the State Director of the Bureau to suspend any issuance of leases in areas affected by Native protests.[33] In turn, the State Director notified the Fairbanks Land Office of the suspension on pending and future applications for leases within the areas under protest. The Fairbanks office was instructed to give notice to the affected parties.[34] A press release to this effect was issued by the Bureau's Anchorage office on November 28, 1966.[35]

On November 30, 1966, the Anchorage Land Office issued a public notice which confirmed that the opening would proceed as scheduled, the drawing of simultaneous filings to be held on December 20, 1966. However, the notice added:

The Native residents of the area have asserted an aboriginal claim to the area and have protested any form of disposition of the land or its resources. The Secretary of the Interior has, therefore, issued instructions to determine successful drawees among the offerors, but to postpone issuance of the leases until the question of the aboriginal claim is further considered.

Upon determination of the successful drawee for each leasing block the first year's rental will not be returnable, unless the offer is rejected. At this time there is no estimate as to when or if the leases will be issued.[36]

On November 30, 1966, a similar notice was posted in the Fairbanks Land Office and published the next day in the local newspaper, the Fairbanks Daily News Miner.[37] It stated in relevant part:

Because the North Slope Native Association has filed claims to the area and has protested the disposition of the land or its resources, the leases won in the drawing will not be issued until Native claims are resolved.

It is not known when the leases will be issued.

Those who have filed bids for leases may withdraw their bids before the drawing. After winners of the leases are drawn, the winners are committed to pay the first year's rent on the land. This rent is not returnable.[38]

On December 1, 1966, Secretary Udall issued a notice, published December 8, 1966 in the Federal Register, announcing the suspension of any lease issuance pending consideration of the protests.[39]

Bureau of Land Management records indicate that of 1131 acceptable simultaneous offers filed, 342 were withdrawn prior to the date of the drawing, and 24 more were withdrawn on December 20, 1966, prior to commencement of the drawing. The records further reveal that the bulk of these withdrawals occurred after November 28, 1966.[40]

The drawing was held as scheduled and the *Rowe* plaintiffs were among those who drew priority status. The *Rowlett* plaintiffs filed offers for various blocks of land within the 16 million acre area designated by Public Land Order, both before and after the Atlantic Richfield mid–1968 dis-

**33.** Memorandum from Acting Regional Solicitor Cassity to State Director Silcock (October 13, 1966). All plaintiffs' offers to lease were for lands located within these areas.

**34.** Memorandum from State Director Silcock to Fairbanks District and Land Office Manager. (October 21, 1966).

**35.** *Rowlett* plaintiffs exhibit No. 1.

**36.** *Rowe* plaintiffs' exhibit No. 55.

**37.** *Rowe* plaintiffs' exhibit No. 54.

**38.** The provision regarding withdrawal of bids merely restated what had been declared in the September notice.

**39.** 31 Fed.Reg. 15494 (December 8, 1966).

**40.** Affidavit of Sue A. Wolf, Chief, Selections and Leasable Minerals Section, Alaska State Office, Bureau of Land Management (Defendant's Attachment # 3). The records also indicate that several of the *Rowe* and *Rowlett* plaintiffs were among those who withdrew lease offers (at least 53 offers).

covery of oil at Prudhoe Bay. In 1969, the Secretary issued Public Land Order 4582 [41] formally withdrawing all public lands in Alaska from mineral leasing, "for the determination and protection of the rights of the Native Aleuts, Eskimos and Indians of Alaska." [42]

In the wake of the land freeze Congress began considering several proposals for settlement of the Native claims for the benefit of both the Natives and the continued orderly development of Alaska. In December 1971, Congress enacted the Alaska Native Claims Settlement Act. The Act expressly extinguished all past or future claims for land or damages arising from aboriginal title.[43] In return, the Natives were granted a monetary settlement of some one billion dollars [44] and allowed to select limited quantities of lands from large tracts withdrawn by Congress under § 1610.[45] The Settlement Act also established twelve Native Regional Corporations, including the Arctic Slope Regional Corporation and smaller Village Corporations to manage the settlement for the benefit of their members.[46] Under provisions of ANCSA § 12(a),[47] Village Cor-

porations were allowed to make selections from lands Congress had withdrawn in § 11 [48] of the Settlement Act. The Act provided that the Village Corporations would receive patent to the surface estate and the Regional Corporation would receive patent to the subsurface estate in equal amounts. In the event the quantity of lands to which a Native corporation was entitled under Sections 12 and 14 [49] proved greater than the available withdrawn lands, Congress provided in § 11(a)(3) [50] that the Secretary would withdraw additional lands, or "deficiency withdrawals," from which the Natives could make the balance of their entitlement.

In part due to the existence of Naval Petroleum Reserve No. 4 and the Arctic National Wildlife Refuge, the Arctic Slope Regional Corporation was unable to make its allowable selections from the withdrawn lands. Accordingly, by a complex multi-step procedure, a sufficient "deficiency withdrawal" was arrived at by the Secretary.[51] The additional withdrawal included lands for which plaintiff lease applicants had previously filed oil and gas lease offers.

**41.** 34 Fed.Reg. 1025 (January 23, 1969).

**42.** The events leading to the PLO 4582 withdrawal are explained in the Secretary's decision below:

In mid–1968, Atlantic Richfield Co. announced its discovery of oil at Prudhoe Bay on lands leased by the State of Alaska. The announcement generated immense interest; in the next half year over 20,000 noncompetitive oil and gas lease offers were filed in Alaskan BLM offices, including offers which covered practically all potentially available land on the North Slope. The Department responded by issuing protective withdrawals, including PLO 4582, 34 Fed.Reg. 1025 (1969), which were designed to maintain the public land status pending legislation for the resolution of Alaska Natives' land claims.
*Arctic Slope, supra,* at p. 3.

**43.** ANCSA § 4, 43 U.S.C. § 1603. *See generally Inupiat Community, supra.*

**44.** ANCSA § 6, 43 U.S.C. § 1605. A sum of $462,500,000 was to be paid by the federal government over a period of 10 years. The remaining $500,000,000 payment was to come from mineral revenues that would otherwise go to the State of Alaska.

**45.** ANCSA § 12(a)–(c), 43 U.S.C. § 1611(a)–(c). The land settlement granted approximately 40,-000,000 acres to the Natives.

**46.** The other Regional Corporations include: Bering Straits Association, Northwest Alaska Native Association, Association of Village Council Presidents, Tanana Chiefs' Conference, Cook Inlet Association, Bristol Bay Native Association, Aleut League, Chugach Native Association, Tlingit-Haida Central Council Kodiak Area Native Association and Copper River Native Association.

**47.** 43 U.S.C. § 1611(a).

**48.** 43 U.S.C. § 1610.

**49.** 43 U.S.C. §§ 1611, 1613.

**50.** 43 U.S.C. § 1610(a)(3).

**51.** The deficiency withdrawals were necessary to equalize the Regional Corporation's subsurface estate selection with the Village Corporations' surface estate selections. These withdrawals were accomplished through several public land orders. PLO 5169, 37 Fed.Reg. 5572 (March 16, 1972), as amended by PLO 5236, 37 Fed.Reg. 18916 (September 16, 1972); PLO 5396, 38 Fed.Reg. 26376 (September 20,

Subsequently, the Regional Corporation selected the balance of its entitlement and in the fall of 1976 the Bureau approved an interim conveyance of the lands selected from the deficiency withdrawal.[52] Part of the lands selected by the Regional Corporation included the same lands for which lease offers under the Mineral Leasing Act had been filed by plaintiffs.

This is the backdrop against which plaintiffs' claims for oil and gas leases are to be considered.

## II. THE ADMINISTRATIVE PROCEEDINGS

The interim conveyance of the lands selected by the Regional Corporation from the "deficiency withdrawal" lands was appealed to the Alaska Native Claims Appeal Board. In view of the serious issues raised in the appeals the Secretary undertook to assume direct jurisdiction over the claims.[53] In his decision of November 24, 1976, the Secretary dismissed the appeals and approved the conveyances. This decision constituted the final action by the agency. On November 30, 1976, an interim conveyance of the lands was made to the Arctic Slope Regional Corporation.[54] This lawsuit followed.

## III. THE *ROWLETT* CLAIMS

A. Was the Secretary Required to Take Action Accepting or Rejecting Lease Applications Prior to November, 1976?

It has long been recognized as a cardinal principle of statutory construction that an agency interpretation of its own regulations is entitled to great weight within areas of agency expertise.[55] However, courts are not obliged to "stand aside and rubber-stamp [agency] affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying the statute."[56]

[O]ne factor to be considered in giving weight to an administrative ruling is "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking in power to control."[57]

The *Rowlett* applicants filed over-the-counter offers from late 1966 through mid-January, 1969, at which time the Secretary issued PLO 4582. These offers were made pursuant to the Secretary's opening orders and 43 C.F.R. 3123. Unlike the *Rowe* plaintiffs, there was no cut-off date beyond which these applicants were barred from withdrawing their offers (and the advance rentals which had accompanied them). Prior to the time the *Rowlett* applicants filed their offers the Secretary and the Bureau had made it amply clear, through several notices, that a large degree of uncertainty surrounded the entire North Slope leasing program, and the prospect of future leases being executed was subject to considerable doubt.

1973). The deficiency withdrawals were also, in part, a result of pending Alaska Statehood Act selections, ANCSA § 3, 43 U.S.C. § 1602(e). *See* notes 78–88 and accompanying text, *infra*.

52. 41 Fed.Reg. 36672 (August 31, 1976) and 41 Fed.Reg. 40193 (September 17, 1976).

53. Order of Nov. 15, 1976, under authority of 43 C.F.R. 4.5 (1976), 30 U.S.C. § 226 and 200 Departmental Manual I.9. A copy of the Secretary's final decision is attached hereto as an appendix.

54. BLM Interim Conveyance Nos. I.C.–047 (November 29, 1976) (Arctic Slope Western) and I.C.–048 (November 29, 1976) (Arctic Slope Eastern (Central)).

55. *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

56. *S.E.C. v. Sloan,* 436 U.S. 103, 118, 98 S.Ct. 1702, 1711–1712, 56 L.Ed.2d 148, 156 (1978) *quoting from Volkswagenwerk v. Federal Maritime Comm'n,* 390 U.S. 261, 272, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968).

57. *Adamo Wrecking Co. v. United States,* 434 U.S. 275, 287–288, 98 S.Ct. 566, 574, n. 5, 54 L.Ed.2d 538, 542 (1978) *quoting from Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944).

Plaintiffs have advanced several arguments in support of their position that the Secretary should have issued leases to them during these interim years, and that they justifiably expected such action. In light of the undisputed facts, I am not persuaded by plaintiffs' arguments in favor of departing from authoritative decisions regarding Departmental issuance of oil and gas leases to over-the-counter lease applicants. It has been squarely held in this Circuit that in the leasing of lands under the Mineral Act,

> The permissive word "may" in Section 226(a) allows the Secretary to lease such lands, but does not require him to do so. Although Section 226(c) requires the Secretary to issue the lease to the first qualified applicant *if* the land is leased, *the Secretary has discretion to refuse to issue any lease at all on a given tract.* (citations omitted).
>
> *Given the Secretary's discretion whether to lease the lands at all, plaintiffs' offer to lease could not, in and of itself, vest plaintiffs with any right to a lease . . .* Burglin v. Morton, 527 F.2d 486, 488 (9th Cir. 1976) (emphasis added).[58]

Moreover, the Court of Appeals for the District of Columbia Circuit held in *Schraier v. Hickel,*[59] that the pendency of an applicant's offer could not interfere with a state selection because (1) *"[t]he fact that the Bureau published a notice that it would receive offers to lease did not preclude a later exercise of discretion to decline to lease"* and (2) an "application for lease, even though first in time or drawn by lot from among simultaneous offers, *is a hope, or perhaps expectation, rather than a claim."*[60] (Emphasis added.) These holdings were but recently reaffirmed in an appeal taken from a decision of this court dismissing a similar challenge by over-the-counter applicants who filed offers in 1967 and 1968, offers rejected by the Secretary in favor of subsequent State selections authorized under the Statehood Act.[61]

I conclude that the *Rowlett* applicants had no cognizable contract or property interest which created a right to issuance of leases. The discretion of whether or not to lease is not exercised when a mere notice is given inviting offers and delineating procedures to be followed. As the District of Columbia Circuit determined in *Duesing v. Udall*[62] "the filing of an application which has not been accepted does not give any right to a lease, or generate a legal interest which reduces or restricts the discretion vested in the Secretary whether or not to issue leases for the lands involved." The Secretary was under no requirement to issue or reject leases within a certain time limit, since "it was the clear intent of Congress to give him discretion."[63] In view of

**58.** Hereinafter *Burglin I; see also Arnold v. Morton,* 529 F.2d 1101, 1106 (9th Cir. 1976); *McTiernan v. Franklin,* 508 F.2d 885, 887 (10th Cir. 1975); *Duesing v. Udall,* 121 U.S.App.D.C. 370, 372, 350 F.2d 748, 750–751 (1965), *cert. denied,* 383 U.S. 912, 86 S.Ct. 888, 15 L.Ed.2d 667 (1966); *Pease v. Udall,* 332 F.2d 62, 63 (9th Cir. 1964); *Haley v. Seaton,* 108 U.S.App.D.C. 257, 260–261, 281 F.2d 620, 623–624 (1960); *Burglin v. Secretary of the Interior,* Nos. A75–113 Civ. and A75–232 Civ. at 6 (D.Ak. Dec. 29, 1976) *aff'd by mem. op.* 582 F.2d 1289 (9th Cir. 1978); *Rowe v. Kleppe,* Civ. No. 75–1152 at 4–5 (D.D.C. July 30, 1976); *McDade v. Morton,* 353 F.Supp. 1006, 1010 (D.D.C.1973), *aff'd* 161 U.S.App.D.C. 237, 494 F.2d 1156 (1974).

**59.** 136 U.S.App.D.C. 81, 419 F.2d 663 (1969).

**60.** At 84, 419 F.2d at 666.

**61.** *Burglin v. Secretary,* Civ.Nos. A75–113, A75–232 (D.Ak. December 29, 1976), *aff'd by*

*mem. op.* No. 77–1655 (9th Cir. August 18, 1978) (hereinafter *Burglin II*).

**62.** 121 U.S.App.D.C. 370, 372–373, 350 F.2d 748, 750–751 (1965), *cert. denied,* 383 U.S. 912, 86 S.Ct. 888, 15 L.Ed.2d 667 (1966).

**63.** *Arnold v. Morton,* 529 F.2d 1101, 1106 (9th Cir. 1976). *See also Udall v. Tallman,* 380 U.S. 1, 4, 85 S.Ct. 792, 13 L.Ed.2d 616 (1964), and cases cited in note 58 *supra.* Plaintiffs argue that the Secretary's failure to act on the lease applications for 10 years somehow violated the "legal protections" guaranteed in *Schraier.* However, the language in *Schraier* merely states that all applicants must have an equal opportunity to contract, that an application may not be rejected on a basis other than that permitted by law. As pointed out by the district court in *Burglin II,* and affirmed by the Ninth Circuit, the failure to make a decision on a lease application for several years is not an action contrary to law.

these authorities and the events relevant to the 1966 drawing, I find plaintiffs' claimed expectations totally unwarranted.[64] No action based upon the Secretary's inaction may lie.

▮ Plaintiffs also argued in their moving papers and at oral argument that even under the limited right of fair consideration recognized in *Schraier,* this Court should find that the plaintiffs were not fairly treated vis-a-vis the defendant Native Regional corporation which ultimately received patent to the land. The error in this argument is rooted in plaintiffs' misunderstanding of this procedural safeguard: the right to be fairly and equally considered applies only among competing lease applicants, not between the applicants and the Natives whose rights were created and vested under other legislation. The Statehood Act recognized and preserved Native rights; thereafter Congress respected those rights through a land and monetary settlement. While Congress could have chosen to recognize an equal or superior right in plaintiffs, it did not do so. Consequently, since plaintiffs do not complain of a lack of fair treatment vis-a-vis other lease applicants, the *Schraier* safeguards have indeed been fully respected.

### B. Did the Secretary Properly Reject Plaintiffs' Lease Applications?

▮ In the course of affirming the Bureau's interim conveyance of ANCSA lands to the Arctic Slope Regional Corporation, the Secretary rejected all pending oil and gas lease applications filed for the same lands, or any part thereof. In so doing, he reasoned that (1) ANCSA § 1621(i)[65] did not authorize the issuance of leases on lands subject to conveyance to Native corporations; (2) the discretion embodied in § 226 of the Mineral Act allowed the Secretary to continue the Department's policy regarding nonleasing of lands arguably subject to Native claims (the policy behind the earlier land freeze) in order not to frustrate Congressional policy in the Settlement Act; (3) issuance of leases in 1976 would "nullify the years of policy decision and withdrawals preventing lease issuance in order to protect the rights of Alaska Natives"; (4) the offerors were not due greater deference due to suspension, rather than rejection, of their applications during the period of Secretarial withdrawals from leasing in aid of legislation.[66]

*Arnold v. Morton* stands for the proposition that the Secretary, in granting or refusing to grant leases, must act upon grounds "which would have been within his discretion at the time of plaintiffs' filing."[67] However, in a footnote the Court elaborates that due to the absence of any time limit on Secretarial action,

> We do not mean to suggest that the Secretary must go through the mental gymnastics of attempting to make the decision he would have made at the time of application. We mean only that a public land order which was issued at a

---

**64.** While plaintiffs allege irreparable harm resulting from the Secretary's inaction during the period from 1966 to 1969 on pending oil and gas lease offers, it is curious to note that many lease applicants actually requested such inaction, apparently in fear that were the Secretary not to delay action the lease offers would be rejected and any priority as an applicant would be lost. The claimants were gambling that the Congressional resolution of Native claims might not dispose of their applications. Ironically, plaintiff claimants, having lost their gamble, now choose to disregard their earlier position and urge as error, the Secretary's failure to act. Kirton affidavit at 7, *Arctic Slope, supra,* at 4. However, as the weight of authority clearly shows, the Secretary had no duty to act despite the existence of lease applications, a

government notice that offers would be received, or the passage of years before final agency action. *Burglin II, supra,* at 8; *Duesing, supra,* 121 U.S.App.D.C. at 372–373, 350 F.2d at 750–751; *Arnold, supra,* at 1106. As discussed elsewhere in this opinion, the *Schraier* or *Arnold* limitations on this discretion did not affect the propriety of the Secretary's decision to defer consideration of accepting lease offers.

**65.** This section must be read in conjunction with 43 U.S.C. §§ 1610(a)(1)–(2), 1615(a). The Secretary also relied on 43 C.F.R. 2091.1(b).

**66.** *Arctic Slope, supra* at 10–11.

**67.** *Arnold v. Morton,* supra at 1106.

time when the Secretary was laboring under a mistake of law cannot in and of itself be a proper ground for the exercise of the Secretary's discretion to refuse the leases. *Id.* at 1106, n. 12.

In the text, the Court adds,

*[W]hile he may not refuse to grant a lease on the basis of the later public land orders per se, it would clearly be appropriate to consider whether the factors which led to the issuance of those orders also indicate that it is not in the public interest to lease the lands in question at this time.* (Emphasis added).

*Id.* at 1106.

While it may be true that some of the Secretary's reasons in his November 24, 1976, decision went beyond the *Arnold* admonishment, I find that given the latitude in the *Arnold* standard, the Secretary reasonably and sufficiently grounded his rejection of plaintiffs' lease offers upon factors clearly in existence in the period from 1966 to 1969, e. g., serious questions had been raised, via Native protests, concerning the status of Native aboriginal rights, and it had become certain that Congress would finally undertake the settling of Native aboriginal claims in Alaska.[68]

While plaintiffs strongly urge that identical factors were involved in all four openings, the record reveals otherwise; the Native response in protest against the fourth opening was immediate and strong, no doubt in large part due to the Bureau's actions in the three earlier openings. Essentially the Secretary found that the same reasons which supported the land freeze policy of 1966 justified rejection of the lease offers. That this policy was in existence in 1966 is further evidenced by the Depart-

ment's submission soon thereafter of a draft bill to settle the Native claims. For the Secretary to have intervened in this area by issuing leases would have usurped the reservations of power in Congress declared in the Statehood Act, usurped the intent of Congress to ultimately deal with Native rights, and would have seriously prejudiced the rights of Alaskan Natives. I cannot say that such a position was irrational, untimely or beyond the scope of the Secretary's broad discretion under the Mineral Act to refuse to issue oil and gas leases. And while there may be several competing opinions as to what action would have been in the public interest, the decision of the Secretary under the circumstances appears to be entirely reasonable and objective.

C.  Objections to Interior Appeal Procedures.

When plaintiffs objected to the interim conveyance of selected lands to the Regional Corporation (under ANCSA) an appeal was lodged with ANCAB. However, prior to a decision in the matter the Secretary assumed original jurisdiction over the appeal, under authority of 43 C.F.R. 4.5 (April 15, 1971). Also involved in the appeals were the still-pending oil and gas lease applications of plaintiffs. Because of the interrelatedness of the ANCSA and Mineral Leasing Act claims, the Secretary took original jurisdiction over the lease applications as well, under authority of Section 226 of the Mineral Act and 200 Departmental Manual 1.9.

Plaintiffs argue that this assumption of jurisdiction, as well as the absence of a hearing, deprived them of their rights under the Administrative Procedure Act, the

---

**68.** *Arctic Slope, supra* at 11. As corroborated by an August 10, 1967 letter from Secretary Udall to then-Governor Hickel, the Department was very much aware at the time of Congress' reservation of power over the disposition of Native land claims expressed in Section 4 of the Alaska Statehood Act:

As you know, the Congress has provided that the Alaska Natives ". . . shall not be disturbed in the possession of any lands actually in their use and occupation or now claimed by them, but the terms under which

such persons may claim title to such lands is *reserved for future consideration by Congress."* (Emphasis added.)

Plaintiffs' Exhibit 41. *See also* Statehood Act, *supra* at Section 4. The Secretary feared that to act would contravene the spirit of this provision and instead, hoped Congress would take up its reserved authority and legislate on the matter. Indeed, in a short time hearings were under way on various proposals, including the Department's, with the 1971 Settlement Act as the result of those efforts.

Department's regulations, and the Due Process Clause.

■ In regard to the Secretary's assumption of original jurisdiction, Subchapter 4.5, Title 43 of the Code of Federal Regulations unambiguously states in part:

Nothing in this part shall be construed to deprive the Secretary of any power conferred upon him by law. *The Secretary reserves under his supervisory powers the right to take original jurisdiction of any case and render the final decision in the matter, after holding such hearing as may be required by law.* . . . (Emphasis added).

Given the clear language of this provision, I find plaintiffs' position regarding the assumption of jurisdiction absolutely untenable. The Secretary's action was an act of discretion, not an abuse thereof.[69] Under the language of the Mineral Leasing Act itself, the Secretary is delegated the discretionary authority to act upon lease applications. Although ordinarily the Bureau performs this function, these applications did not arise in an ordinary situation. I find the Secretary's decision to review the appeal and the lease applications to be a decision well within his discretion and not subject to review in this Court.

I also reject plaintiffs' position that since the Government did not have sufficient time to file briefs in opposition to plaintiffs' appeals, plaintiffs' rights were somehow prejudiced. Plaintiffs were able to file a comprehensive and well-considered 59-page appellate brief with the Board. Accordingly, I find no prejudice.

■ Finally, in regard to the absence of a hearing, plaintiffs argue that applicable regulations required a hearing before the Secretary prior to issuance of a decision, a hearing in which evidence could be heard and reviewed. Plaintiffs conclude from the Secretary's failure to hold a hearing that their due process rights were violated. Without reaching defendants' argument based upon *Rowe v. Kleppe,* No. 75–1152 (D.D.C. July 29, 1976) that plaintiffs' interests in the land did not rise to an interest protectable under the due process clause, I find that the absence of a hearing was proper in this instance. The Department's hearing regulations provide for evidentiary hearings in appeals before the Interior Board of Land Appeals[70] and the Alaska Native Claims Appeal Board.[71] The two regulations are substantively identical and provide that a hearing "on an issue of fact" may be held in the discretion of the Board. The Secretary found that in these appeals there were no unresolved issues of fact which might be dispositive of the case, and that the questions raised were purely legal questions.[72] In light of this finding, well supported in the record, the Secretary properly exercised his discretion not to order a hearing. Plaintiffs' motion on this ground is also denied.

D. Did the Pickett Act Require the Secretary to Issue a Public Land Order in 1966?

■ Plaintiffs have argued in their briefs that even if the Secretary generally had discretionary authority under the Mineral Leasing Act to reject lease offers after the date of the drawing, in the fall of 1966 the Secretary issued several notices to the effect that action on lease applications for the North Slope would be *suspended,* not rejected, until further consideration was given to the claims of aboriginal title asserted by various Native groups. Plaintiffs argue that this action, having not been accomplished through means of a public land order declaring a withdrawal, exceeded the Secretary's authority given the proscriptions of the Pickett Act.[73]

---

**69.** *I might add that absent any offer of proof of malignant motivation on the part of the Secretary, I fail to see what possible prejudice this action could have wrought upon plaintiffs.*

**70.** 43 C.F.R. 4.911(c) (1975).

**71.** 43 C.F.R. 4.415 (1975).

**72.** *Arctic Slope, supra* at 12.

**73.** 43 U.S.C. § 141–143; E.O.No.10355, 17 Fed. Reg. 4831 (May 26, 1952), (repealed 1976).

The Pickett Act provided that the President, acting through the Secretary of the Interior, could

"at any time in his discretion, temporarily withdraw from settlement, location, sale, or entry any of the public lands of the United States, including Alaska, and reserve the same for . . . classification of lands, or other public purposes to be specified in the orders of withdrawals . . . ."[74]

When Executive Order 10355 was signed, delegating the Act's authority to the Secretary, it provided in Section 1(b) that:

All orders issued by the Secretary of the Interior under the authority of this order shall be designated as public land orders

. . . .

Nothing in the Pickett Act restricted the manner in which the Secretary was to exercise his authority over public lands when such action was based on grants of authority derived from *other* Acts of Congress. By its own terms the § 1(b) restriction applied only to orders issued under authority of the Pickett Act. When the Secretary acted under the authority of the Mineral Act to suspend Bureau action on lease applications, he was beyond the reach of the Pickett Act and therefore not required to act exclusively through issuance of a public land order.

To hold otherwise would be equivalent to declaring that unless the Secretary accepts or rejects lease offers immediately upon receipt thereof, he must issue a public land order announcing a withdrawal of the subject lands. Then, when he is ready to act, he must issue a revocation of the order in the form of another public land order. Given the intent of Congress in the Mineral Act to grant broad discretion to the Secretary on whether or not to lease public lands, I do not agree that Congress intended each such discretionary action to constitute a "Pickett Act" action. There is no support for such a position in either act, and counsel

have pointed to none in their briefs. Rather, at least one Court of Appeals that has addressed the argument has endorsed the Department's interpretation of the Pickett Act set forth in *Richard K. Todd, et al.,* 68 I.D. 291, 296, in which then Assistant Secretary Carver observed

Stripped of all authority to withdraw lands, the Secretary would still have his discretionary authority to refuse to issue leases where he thinks issuance would not be in the public interest.

The formal exercise by the Secretary of his discretionary authority is nothing new in the administration of the Mineral Leasing Act.[75]

I find this reasoning persuasive and therefore conclude that the Secretary's decision to withhold action on numerous North Slope leasing applications was well within the discretion granted in the Mineral Act and did not contravene the constraints of the Pickett Act.

On the basis of the above discussion I conclude that plaintiffs' over-the-counter applications for oil and gas leases, filed in response to a departmental invitation to submit such offers on specified lands, did not confer any substantial contract or property rights upon the applicants. Despite the "invitation," the law is well settled that the Secretary did not forfeit any discretion to consider—and reject—such applications at any time in the future. I further conclude that the Secretary properly based his rejection of plaintiffs' lease offers upon a reasonable belief that issuance of leases was not in the public interest.

E. Were the "Deficiency Withdrawals" in the North Slope Region an Abuse of Discretion by the Secretary of the Interior?

█ Plaintiffs have argued that the process by which ANCSA deficiency withdrawals were computed[76] for selection by de-

---

**74.** 43 U.S.C. § 141.

**75.** Quoted with approval in *Duesing v. Udall,* 121 U.S.App.D.C. at 372, 350 F.2d at 751 (1965).

**76.** Under the Settlement Act, the Secretary is directed to follow a comprehensive and highly complex formula in withdrawing sufficient acreages from the public domain to satisfy the statutory entitlement granted to Regional and Village Native Corporations. ANCSA Section

fendant Regional Corporation was arbitrary, capricious and an abuse of discretion. I find this argument without merit.

At the outset, it should be observed that based on plaintiffs' failure to establish a cognizable property interest in the lands withdrawn by the Secretary, plaintiffs face a serious standing problem [77] in challenging the propriety of the ANCSA § 11(a) withdrawals and subsequent conveyances to defendant Regional Corporation.

Nevertheless, even if standing to raise this argument were established by plaintiffs, the claim of arbitrariness must be rejected. Upon examination, the process by which the deficiency withdrawals were computed demonstrates a responsible and rational exercise of discretion by the Secretary.

In fulfilling his responsibility under ANCSA, then Secretary Morton created an Alaska Task Force [78] in January 1972, to determine the location, amount and type of public land withdrawals needed to comply with the Act.[79] The affidavits submitted by the government regarding the withdrawal calculations for the Arctic Slope region detail the groundwork done by ATF's working group, including the step-by-step calculations which led to the determination of necessary Village and Regional Corporation deficiency withdrawals, and the consideration of other withdrawals required by ANCSA.[80] These preliminary results were presented to ATF in February 1972. Following consultation with representatives of Native groups, ATF directed its working group to outline the necessary withdrawals based upon certain additional determina-

---

11(a)(1), 43 U.S.C. § 1610(a)(1) establishes a congressionally created "pool" of specific lands from which Native Corporations may make their selections:

> The following public lands are withdrawn, subject to valid existing rights, . . . :
>> (A) The lands in each township that encloses all or part of any Native village identified pursuant to subsection (b) of this section;
>> (B) The lands in each township that is contiguous to or corners on the township that encloses all or part of such Native village; and
>> (C) The lands in each township that is contiguous to or corners on a township containing lands withdrawn by paragraph (B) of this subsection.

Should the acreages so withdrawn prove insufficient to satisfy a Native Corporation's entitlement, the Secretary is directed, in subsection (a)(3)(A), 43 U.S.C. § 1610(a)(3)(A), to

> . . . withdraw three times the deficiency from the nearest unreserved, vacant and unappropriated public lands. In making this withdrawal the Secretary shall, insofar as possible, withdraw public lands of a character similar to those on which the village is located and in order of their proximity to the center of the Native village . . . . .

Subsection (a)(3)(B) further conditions that such "deficiency withdrawals" be made "on the basis of the best available information within sixty days of December 18, 1971, or as soon thereafter as practicable."

Section 12(a)(1), 43 U.S.C. § 1611(a)(1) directs Village Corporations to select the withdrawn lands up to the amount of their entitlement. In the event a Village Corporation selects the surface estate to lands located within the National Wildlife Refuge System or Naval Petroleum Reserve No. 4, the related Regional Corporation is directed to make its comparable subsurface estate selection from other "in lieu" lands withdrawn in § 11(a)(3)(A). Further limitations on Native corporation selections are provided in the balance of § 12 and in § 14, 43 U.S.C. § 1613.

**77.** *See Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 152–153 (1970); *Rowe v. Kleppe*, Civ. No. 75–1152 at 9 (D.D.C. July 29, 1976) (Noncompetitive oil and gas lease applicants denied standing to challenge procedural irregularities of Alaska Statehood Act § 10 withdrawals); *see also Raypath, Inc. v. City of Anchorage*, 544 F.2d 1019, 1021 (9th Cir. 1976) "[T]he validity of a deed or patent from the federal government may not be questioned in a suit brought by a third party against the grantee or patentee".

**78.** Hereinafter "ATF".

**79.** Defendants' Attachment I, affidavit of Theodore G. Bingham, former Chief, Division of Lands and Realty, Bureau of Land Management, at 2 ["Bingham Affidavit"]. *See also* Defendants' Attachment II, affidavit of Gordan Paul Kirton, Office of the Solicitor, Department of the Interior (legal counsel to the Alaska Task Force), ["Kirton Affidavit"].

**80.** *See*, e. g., ANCSA § 17(d)(1), (2), 43 U.S.C. § 1616(d)(1), (2) (public interest lands, national parks, forest, wildlife refuges, and wild and scenic rivers), ANCSA § 22(e), 43 U.S.C. § 1621(e) (additions to the national wildlife refuge system for lands selected by Natives).

tions, including the order of priority in which entitlements would be satisfied.[81] The working group proceeded to plot out the actual lands involved and these map plottings formed a basis for the overall public land orders issued in March 1972.[82]

As attested to by Mr. Bingham, former Chief of the Division of Lands and Realty for the Bureau, the task of determining the proper withdrawals needed for the Arctic Slope region raised unusual problems.

> Due to the size and configuration of the Arctic Slope region, its few villages, the existence of [Naval] Petroleum Reserve No. 4, the Arctic National Wildlife Range, State selections at Prudhoe Bay and the [oil pipeline] utility corridor, there was a substantial deficiency factor for the region.[83]

In the ensuing months the ATF working group continued to update its statistical information and to revise the assumptions upon which the withdrawals had been based.

In September 1972, a delegation from defendant Regional Corporation met with members of ATF to discuss numerous differences of opinion as to the manner in which ANCSA § 11(a)(3) deficiency withdrawals had been computed. Among other things, the Regional Corporation challenged many of the assumptions upon which the initial withdrawals had been made. Following three days of discussion and consultation between the parties and the Secre-

tary, the Secretary and ATF agreed, based upon revised calculations, that the acreages withdrawn in the Arctic Slope region as regional deficiency withdrawals should be augmented by 1,215,568 acres.[84] A public land order amending the earlier March 1972 withdrawal was, in turn, issued.[85]

Nevertheless, insufficient knowledge concerning many factors resulted in certain continuing inadequacies. In September 1973, it was again necessary to modify the acreages based upon newly-acquired enrollment data and revised statistics.[86] Five subsequent public land orders were required before the withdrawal process was finally completed, based on the best information available at the time, in December 1975.[87] It was from these combined withdrawals that defendant Regional Corporation ultimately filed their selection applications which were later approved by the Bureau in 1976.[88]

Given the highly complex nature of the calculations involved in establishing the necessary deficiency withdrawals, and the continuing efforts of the Department over the course of four years to modify and revise the withdrawal calculations as errors and new information came to its attention, I conclude that the deficiency withdrawal process employed by the Department was not arbitrary or capricious, nor did it constitute an abuse of discretion. Indeed, the government has shown that the utmost care and consideration was given to this laby-

---

81. The priority of entitlements was ordered as follows: 1) village deficiencies; 2) ANCSA § 22(e) additions, ANCSA § 17(d)(2) withdrawals and regional deficiencies (to be treated equally); and, 3) ANCSA § 17(d)(1) withdrawals and remaining state selection rights (to be treated equally). Bingham affidavit at 6–7.

82. P.L.O. 5169 through P.L.O. 5188, 37 Fed. Reg. 5572–5591 (March 16, 1972). The deficiency withdrawals needed for the Regional and Village Corporations of the Arctic Slope region were announced in P.L.O. 5169.

83. Bingham affidavit at 7–8.

84. Kirton affidavit at 3.

85. P.L.O. 5256, 37 Fed.Reg. 18916 (Sept. 16, 1972). These acreages were drawn from lands previously withdrawn under ANCSA § 17(a)(1)

(64,448 acres), § 17(d)(2) (736,400 acres) and from previously unreserved lands (414,720 acres). The modifications in ATF's working assumptions are detailed in Mr. Kirton's affidavit in paragraph 7, pp. 4–6.

86. *Id.* at 8–9. P.L.O. 5396, 38 Fed.Reg. 26376 (September 20, 1973).

87. P.L.O. 5428, 39 Fed.Reg. 27666 (July 25, 1974); P.L.O. 5439, 39 Fed.Reg. 38646 (October 25, 1974); P.L.O. 5448, 39 Fed.Reg. 41364 (November 20, 1974); P.L.O. 5455, 39 Fed.Reg. 43549 (December 11, 1974); P.L.O. 5556, 40 Fed.Reg. 58146 (December 12, 1975).

88. 41 Fed.Reg. 36672 (August 31, 1976); 41 Fed.Reg. 40193 (September 17, 1976).

rinthine undertaking. The evidence is uncontroverted in this regard and therefore plaintiffs' motion on this ground is also denied.

### F. May Plaintiffs Claim Protection Under ANCSA's "Savings Clause"?

■ Because of my finding that plaintiffs lacked any substantive rights whatsoever in the ultimate award of leases, it follows inescapably that plaintiffs cannot claim any protection from the savings clause of ANCSA, § 14(g), which clause preserves "valid existing rights." [89] The *Schraier* court convincingly demonstrated that the rights of lease applicants cannot rise above an inchoate hope or expectation such as would draw plaintiffs within the protection of the Alaska Statehood Act's savings clause. Since ANCSA's savings clause is notably more restrictive than that of the Statehood Act,[90] the Secretary correctly concluded that plaintiffs' claim must similarly fall beyond reach of the Settlement Act.[91] Accordingly, the Secretary's decision in *Arctic Slope* is affirmed in all

respects; defendants' motion for summary judgment on all issues is granted. Plaintiffs' motion is denied.[92]

### IV. THE *ROWE* PLAINTIFFS

As more fully described in Part I, *supra,* the *Rowe* plaintiffs differ from the *Rowlett* plaintiffs in that they filed simultaneous offers within a pre-set deadline. Prior to the date of the drawing these applicants could withdraw their offers, and recoup the prepaid first-year's advance rentals. However, after the drawing the offers could not be withdrawn, nor could the prepaid rentals be recouped unless the Secretary took action and rejected the offers. In return for this more restrictive procedure, the *Rowe* plaintiffs acquired a priority to entitlement to leases, should leases be issued. Thus, these "first-shot" plaintiffs were spared the uncertainty of having to file first-in-time to get priority status. The Department also benefited from these procedures by (1) avoiding any frenetic rush to file offers on the first day of the land opening, and (2)

---

89. 43 U.S.C. § 1613(g). The savings clause provides in part:

All conveyances made pursuant to this chapter shall be subject to valid existing rights. Where, prior to patent of any land or minerals under this chapter, a lease, contract, permit, right-of-way, or easement . . . has been issued for the surface or minerals covered under such patent, the patent shall contain provisions making it subject to the lease, contract, permit, right-of-way, or easement, and the right of the lessee, contractee, permittee, or grantee to the complete enjoyment of all rights, privileges, and benefits thereby granted to him. Upon issuance of the patent, the patentee shall succeed and become entitled to any and all interests of the State or the United States as lessor, contractor, permitter, or grantor, in any such leases, contracts, permits, rights-of-way, or easements covering the estate patented . . . .

90. The House Conference Report No. 92–746 that accompanied ANCSA does not suggest a different result. Although the Joint Statement of the Committee of Conference did reflect the understanding that "[a]ll valid existing rights, including inchoate rights of entrymen and mineral locators, [were] protected," plaintiffs here had no special right to acquire the public lands in dispute, nor did they make any entry thereon (or mineral location) such as would render consideration of the above statement germane.

See House Conference Report No. 92–746, 92nd Cong., 1st Sess., (Dec. 13, 1971), 1971 U.S.Code Cong. & Admin.News pp. 2192, 2250.

91. *Arctic Slope, supra* at 5.

92. Both groups of plaintiffs argued in their briefs that they should have received notice of the proposed conveyance to ASRC of the lands they sought to lease. As argued with respect to the denial of a hearing, defendants urge the due process argument accepted by the District of Columbia Circuit Court of Appeals in *Rowe v. Kleppe, supra.* Because I find the plaintiffs *did* have notice, I need not reach this constitutional argument. Plaintiffs received notice as early as March 16, 1972 (37 Fed.Reg. 5572) that the Secretary had withdrawn the lands they sought to lease pending ANCSA selections by ASRC. ASRC's selections were recorded on public records maintained in the Fairbanks office of the BLM. Moreover, the proposed conveyance was publicized in two Federal Register notices in the fall of 1976. *See* note 52, *supra.* Regardless of any legal right of notice, plaintiffs indeed had several opportunities to be informed of the ASRC selection. More on the part of the Department was not required. Plaintiffs' motion on this ground is therefore denied.

eliminating to a large degree the chance for brokering of priorities by speculators.

■ The non-returnability of the first-year's rental had been announced in the September 1966 opening notice as one of the filing requirements necessary for an offer to be eligible for the drawing.[93] Plaintiffs argue that while not explicitly stated in the notice, this provision for non-returnability indicated that the Department agreed to be bound to issuance of leases to successful drawees. I disagree.

The opening notices published in the Federal Register made it abundantly clear that the filing of an application constituted an "offer to lease,"[94] and that the applicant agreed he would be bound to a lease "if such a lease is issued to him as a result of the drawing." Nowhere in the notice is there mention that the non-returnability provision altered the Secretary's traditional discretion over whether or not to lease.

The Secretary's purpose in changing the last three opening notices in respect to the non-returnability of the first-year's rental was solely to prevent an obstructive practice of certain applicants who would withdraw their first-drawn offers, after the drawing but prior to lease issuance, if they were unsuccessful in bartering their lease priority. Under prior practice speculators could file offers on numerous blocks of land, tendering the nominal $10.00 filing fee per offer. If any of the offers became "first-drawn" offers following the drawing, the speculators would seek to sell those offers to a third party, for a profit. If a lease could not ultimately be sold, the first-drawn offer was withdrawn before any leases were executed. The non-withdrawal provision for advance payment of the first-year's rental was a remedial measure designed to discourage such speculation (and the resulting obstructive effect on the Bureau office) and to require offerors, as defendants so aptly state, to "cover their bets."

Paragraph 3(d) of the first opening notice had not put a halt to the speculators because it seemed to allow for withdrawal of lease offers anytime prior to execution of a lease.[95] As a result, the several exhibits offered by plaintiffs evidence a clear recognition within the Bureau that a clearer provision for non-returnability after the drawing would remedy the recognized abuse.[96]

The documents uniformly reveal a singular Bureau intent in the notices to provide for a non-returnability policy that would be consistent with the regulations in existence at the time; particular accounting procedures were never intended to add more to this limited goal.[97] There is no support anywhere for plaintiffs' theory that paragraph 3(d) of the notice was somehow also

93. See note 24, supra. The same provision was contained in regulations in effect at the time. 43 C.F.R. § 3123.9(c)(3) 1966.

94. 30 Fed.Reg. 898, ¶ 3(c) (January 28, 1965); 30 Fed.Reg. 11697 ¶ 3(c) (September 11, 1965); 31 Fed.Reg. 4741 ¶ 3(c) (March 19, 1966); 31 Fed.Reg. 12575 ¶ 3(c) (September 23, 1966).

95. Plaintiffs' exhibits 13, 17 and 20 reveal that even in the first opening the Bureau had intended that advance rentals would not be returnable. Nevertheless, the wording had not adequately conveyed the intent.

96. Plaintiffs' exhibit 22 reveals that the administrative purpose in the change was solely to remedy the ambiguity and prevent the above described practice. It was also felt that the new language would be fully consistent with its counterpart in the regulations, 43 C.F.R. 3123.-9(c)(3), referring both to non-refundability and the requirement of lease execution. See note

98, infra. Memorandum from Ross Youngblood, Manager, Fairbanks District and Land Office, to State Director Burton Silcock, BLM (June 24, 1965). See also plaintiffs' exhibit 24, Memorandum from State Director Burton Silcock to Director, BLM, (June 30, 1965). The Secretary also remarked in his Arctic Slope opinion that:

The change in policy from earlier drawings was designed to prevent the obstructive practice of withdrawal of first drawn offers prior to lease issuance.

Arctic Slope, supra at 6.

97. Plaintiffs' exhibits Nos. 31–33, when combined with the instructions given to Bureau employees as to procedures to be followed in the openings, indicate that the depositing of advance rentals in the "earned account" was purely an accounting device and was never intended to indicate acceptance of the simultaneous lease offers.

intended to alter the established policy and requirements of law [98] that lease acceptance remain within the full discretion of the Secretary up until a designated government official had executed leases in favor of priority-holding applicants.

It cannot be disputed that, as plaintiffs urge, the opening notice would never have issued had the Department not determined that it desired to take the first steps in leasing the subject North Slope lands. However, it is equally well established in the Mineral Act, the interpretative regulations, and the authorities cited in Part II, B, above, that the Secretary's ultimate discretion to accept or reject a lease offer was not in any way reduced by the issuance of the notice.

Two other points are significant in this matter. First, paragraph (d) of the notice, in addition to the regulations,[99] clearly contemplated that during the period following the drawing (when the offers and advance rentals could not be voluntarily withdrawn) the Bureau could reject a lease offer and be required to refund the advance rental; if such a rejection occurred the notice went on to provide that the advance rentals would be returned to the rejected applicant. By its own terms that provision is unrestricted as to the possible bases for rejection of an offer. Plaintiffs' reading of this same provision would urge that a rejection based upon a non-compliance with the regulations was within the intended scope of paragraph (d), but that a rejection based upon the

Secretary's discretion under § 226(c) of the Mineral Act was not intended to be within its scope. I find nothing in any of the notices, or the regulations, to support plaintiffs' reading.

Second, the Department's own regulations, in force at the time, explicitly stated that acceptance of a lease offer would be indicated by the exclusive method of the Secretary's signature on the lease form.[100] The September notice provided in paragraph (a) that "the provisions of this notice shall supersede any provisions of the regulations with which they may be in conflict." But it also provided that absent a conflict, the regulations in 43 C.F.R. Part 3120, were to govern. Although there are clear departures from the regulations in certain procedures to be followed by lease applicants (i. e., the use of the new drawing card), the language of the opening order—and the underlying administrative intent—reveal no departure in the area of acceptance of lease offers. Rather the notice is entirely consistent, as is its counterpart in § 3123.9(c)(3) of the regulations, with the acceptance-by-execution provision of 43 C.F.R. § 3123.5(b). The reference in ¶ 3(c) of the notice regarding possible issuance of leases further supports this reading. Finding no conflict between the notice and the lease execution provisions of the regulations, I conclude that acceptance of a simultaneous lease offer could not have been indicated in any manner other than by a signature of the appropriate officer on the lease form.

**98.** Section 3123.9(c)(3) of the regulations in effect at the time provided in pertinent part:

Upon determination of the successful drawee for a particular leasing unit, the first year's rental will not be returnable and will be earned and deposited in the United States Treasury *upon execution of the lease in behalf of the United States.* [Emphasis added]. 43 C.F.R. § 3123.9(c)(3).

Section 3123.5 further provided that

(b) The United States will indicate its acceptance of the lease offer, in whole or in part, and the issuance of the lease *by the signature of the appropriate officer thereof in the space provided.* [Emphasis added].

43 C.F.R. § 3123.5(b).

The requirement of execution was absolutely clear from the regulations and was in no way abrogated by the language of the opening notice which merely restated what was evident from the regulations themselves. Other courts have agreed that lease execution is the only manner in which acceptance by the United States of a lease offer may be indicated. *See McDade v. Morton,* 353 F.Supp. 1006, 1010 (D.D.C.1973), *aff'd per curiam,* 161 U.S.App. D.C. 237, 494 F.2d 1156 (1974).

**99.** 43 C.F.R. § 3123.9(c)(3).

**100.** 43 C.F.R. 3123.5(b). The regulation explicitly states that acceptance and lease issuance occur by the single act of signature. See note 98, *supra.*

Under the two leading cases of the Supreme Court discussed earlier,[101] I am required to uphold the decision of the Secretary if I find that its reasoning and its interpretation of its own regulations contain the "power to persuade." Indeed, I find that the Secretary's decision interpreting paragraph (c) of the September notice as a narrow provision designed solely to reduce lease brokering is a reasonable, if not the only interpretation consistent with the Department's prior procedure in its oil and gas leasing programs. I further find that the statutory mandate of the Mineral Act is not impeded, and indeed is buttressed by the retention of discretion to lease until the moment at which leasing occurs through execution. The Secretary's decision regarding the manner of acceptance is therefore affirmed.[102]

The *Rowe* plaintiffs have raised numerous other objections to the Secretary's action in suspending lease issuance and ultimately rejecting the lease offers. Because of the result reached above on plaintiffs' arguments regarding the Department's method of acceptance, I conclude that the *Rowe* plaintiffs had an identical legal interest as had the *Rowlett* plaintiffs (save, of course, for the different types of priority each one acquired if leases had been issued). For all the reasons already set out in my discussion of the *Rowlett* plaintiffs' claims, plaintiff Rowe's cross motion for summary judgment is also denied in all respects. The motions for summary judgment submitted by the defendants are granted in their entirety.

I have granted defendant's summary judgment motion against all of plaintiffs' claims for relief, both equitable and monetary. Because of this result, there is no need to dismiss any part of plaintiffs' complaint on the ground that the Court of Claims has exclusive jurisdiction over damage claims against the Government in excess of $10,000.00. This is so because none of plaintiffs' claims have survived summary judgment on the merits. Accordingly, the actions are hereby dismissed with prejudice.

ORDERED ACCORDINGLY.

APPENDIX

# United States Department of the Interior

OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20240
Nov. 24, 1976.

In Re Arctic Slope/Western,
In Re Arctic Slope/Western (Central)
ANCAB # RLS 76–11(A)–(MM)
ANCAB # RLS 76–12(A)–(O)
BLM F–19148 *et al.*

---

DECIDED

Appeals from decisions of the Alaska State Office, Bureau of Land Management, to issue conveyances to Alaska Native Corporation.

APPEARANCES: Robert L. Hartig, Esq., of Cole, Hartig, Rhodes, Norman and Mahoney, Anchorage, Alaska, for appellants; James Wickwire, Esq., of Wickwire, Lewis, Goldmark, Dystel and Schorr, Seattle,

---

**101.** *See* notes 56–57, *supra*.

**102.** While I find it unnecessary to pigeonhole the leasing procedure here employed into a recognized form of contract, I note that the method of soliciting binding offers while retaining a discretion to not accept is not wholly unlike the course of events characteristic of an option contract or an irrevocable offer. Restatement, 2d of Contracts § 24A. The "consideration" from the Secretary would be his promise to lease only to the offeror, if he decided to lease at all. In this context, plaintiffs' argument of a lack of "mutuality" is rejected. *See also* 17 C.J.S. Contracts § 100(4), at 804 (1963), and Supp. (1978).

Washington, for appellee Arctic Slope; John W. Burke, Esq., Office of the Regional Solicitor, for appellee Bureau of Land Management, and others.

## DECISION BY THE SECRETARY

John T. Rowlett and others have appealed from the decision of the Alaska State Office, Bureau of Land Management (BLM), dated August 25, 1976, 41 F.R. 36527 (August 30, 1976), to issue conveyance of public lands to appellee Arctic Slope Regional Corporation under the authority of the Alaska Native Claims Settlement Act (ANCSA), 43 U.S.C. § 1601 *et seq.* The appeal has been docketed by the Alaska Native Claims Appeal Board (ANCAB) as *In Re Arctic Slope/Western,* ANCAB # RLS 76–11(A)–(MM).

John T. Rowlett and others have appealed from the decision of the Alaska State Office, BLM, dated September 13, 1976, 41 F.R. 40193 (September 17, 1976), to issue conveyance of other public lands to appellee Arctic Slope Regional Corporation under ANCSA. This appeal has been docketed by ANCAB as *In Re Arctic Slope/Eastern (Central),* ANCAB # RLS 76–12(A)–(O).

By Order issued November 15, 1976, under the authority of 43 CFR 4.5, section 17 of the Mineral Leasing Act of 1920, 30 U.S.C. § 226, and 200 Departmental Manual 1.9, I took original jurisdiction over the appeals before ANCAB and the noncompetitive oil and gas lease offers pending in the Alaska State Office, BLM, involved in the appeals before ANCAB.

Appellants in these cases are all the first qualified offerors for noncompetitive oil and gas leases under the provisions of section 17 of the Mineral Leasing Act of 1920, 30 U.S.C. § 226.

The lands in question are on the "North Slope" of the Brooks Range in northern Alaska. During and after World War II, all public lands in northern Alaska were withdrawn from all forms of entry and disposal. Public Land Order (P.L.O.) No. 82, 8 F.R. 1599 (January 23, 1943). As the military demands for the land diminished and the private sector's requests for permission to explore the area for oil and gas increased, P.L.O. No. 82 was revoked and a system for opening the land to leasing under the Mineral Leasing Act established. P.L.O. No. 1621, 23 F.R. 2637 (April 18, 1958), P.L.O. No. 3521, 30 F.R. 271 (January 5, 1965).

These orders opened the land to the filing of noncompetitive oil and gas lease offers upon the completion of protraction map-leasing diagrams and opening orders notifying the public that leasing blocks had been established and that offers would be received on those blocks. These openings commenced in January 1965 (Appellants' Ex. 12), beginning with the north-central portion of the North Slope, and continued through the Notice that offers could be filed for land in the Western Arctic involved in these appeals (Appellants' Exhibit No. (Ex.) 1, 31 F.R. 12575 (September 23, 1966)).

The opening orders provided that offers filed before a certain date would be regarded as having been simultaneously filed. When more than one offer was filed for a tract, a drawing was held to establish the first qualified offeror if a lease were to issue. Those tracts for which no offers were filed during the period specified in the opening order then were subject to over-the-counter offer filings. Under this system, public land on the North Slope not otherwise withdrawn was available for the filing of noncompetitive lease offers either 1) by simultaneous filings under an opening order, or 2) by over-the-counter filings.

During this period various Native groups filed protests against lease issuance in the Fairbanks District and Land Office, BLM. In response to the protests, the Department issued a press release November 28, 1966, manifesting its intention to hold the drawing noticed by the opening order of September 23, 1966 (Ex. 1), but not to issue any leases on the first-drawn offers until the Native protests were resolved (Ex. 5). On November 30, 1966, the Department posted a public notice to the same effect (Ex. 6). On December 1, 1966, the Secretary signed

a *Federal Register* notice confirming this policy. 31 F.R. 15494 (December 8, 1966). The drawing at issue in some of the appeals here was held, pursuant to this policy, on December 20, 1966, and no leases have been issued.

Over-the-counter offers continued to be filed for lands on which no offers were received in the drawings. In mid-1968, Atlantic Richfield Co. announced its discovery of oil at Prudhoe Bay on lands leased by the State of Alaska. The announcement generated immense interest; in the next half year over 20,000 noncompetitive oil and gas lease offers were filed in Alaskan BLM offices, including offers which covered practically all potentially available land on the North Slope.

The Department responded by issuing protective withdrawals, including P.L.O. No. 4582, 34 F.R. 1025 (1969), which were designed to maintain the public land status pending legislation for the resolution of Alaska Natives' land claims. Subsequently, section 11(a)(1), (a)(2) and (b)(3) of ANCSA, 43 U.S.C. § 1610, and Secretarial withdrawals under the authority of section 11(a)(3) of ANCSA, 43 U.S.C. § 1610(a)(3), expressly prevented lease issuance.

In response to the intense interest of the offerors in maintaining their first qualified status in case the lands were not conveyed under ANCSA, the Department did not reject all such pending applications wholesale. Rather it suspended action on them until the land selection rights granted the Natives by ANCSA were exercised, and it could be determined what land was still public land subject to leasing.

Briefly stated, in their statement of reasons for appeal, they assert the following against the decisions to issue conveyance to appellee Arctic Slope Regional Corporation.

One group of appellants asserts "vested interests" in the lands in question dating from December 20, 1966, under simultaneously-filed, noncompetitive oil and gas lease offers drawn first by the Bureau of Land Management under the opening orders described above and the provisions of 43 CFR Subpart 3123 (1966), now 43 CFR Subpart 3112 (1975). These appellants are listed in Appendix A.

A second group of appellants, including all appellants in *Arctic Slope/Central (Eastern),* holds "interests" in the lands to be conveyed by virtue of first-filed over-the-counter noncompetitive lease offers. These appellants are listed in Appendix B.

The Secretary's failure to act timely in issuing leases on the offers has prejudiced appellants.

Appellants also assert they are entitled to decisions on their lease offers before subsequent "requests" are considered, and that they are entitled to issuance of executed leases covering the lands to be conveyed.

Before treating appellants' arguments, I state the law pertaining to noncompetitive oil and gas leasing under section 17 of the Mineral Leasing Act of 1920, 30 U.S.C. § 226. Section 17 provides that the Secretary "may" issue noncompetitive oil and gas leases on lands not within any known geological structure of a producing oil or gas field to the first qualified applicant therefor. In *Udall v. Tallman,* 380 U.S. 1, 4, 85 S.Ct. 792, 795, 13 L.Ed.2d 616 (1965), the Supreme Court stated, "Although [the Mineral Leasing] Act directed that if a lease was issued on such a tract, it had to be issued to the first qualified applicant, it left the Secretary discretion to refuse to issue any lease at all on a given tract." *See also Pease v. Udall,* 332 F.2d 62 (9th Cir. 1964); *Haley v. Seaton,* 108 U.S.App.D.C. 257, 260–263, 281 F.2d 620, 623–26 (1960).

In *Schraier v. Hickel,* 136 U.S.App.D.C. 81, 85, 419 F.2d 663, 667 (1969), the Circuit Court of Appeals applied *Tallman* and characterized a noncompetitive oil and gas lease offer as a "proposal" which "does not rise to the level of 'claim' or 'right' within the saving clause of the Statehood Act where there has been no such determination to lease." The savings clause of section 6(b) of the Alaska Statehood Act, 72 Stat. 339, 48 U.S.C. note preceding § 21, makes the State's grant subject to "any valid existing claim, location, or entry . . . ." This is even more protective of outstanding inter-

ests than the savings clause of ANCSA. Section 14(g) of ANCSA, 43 U.S.C. § 1613(g), makes all conveyances "subject to valid existing rights." We believe there is no distinction between the Statehood Act and ANCSA relevant in resolving the conflict between either of the statutory grants and pending noncompetitive oil and gas lease offers.

In *Arnold v. Morton*, 529 F.2d 1101, 1105 (9th Cir. 1976), the Circuit Court of Appeals reaffirmed the conclusion that a noncompetitive oil and gas lease offeror has no right to a lease, and no property interest in his offer. Although the Court in *Arnold* concluded that the Secretary had erroneously determined that the lands in question were not subject to leasing, the Court rejected the contention that it could order lease issuance.

The Secretary's discretion in noncompetitive oil and gas leasing, and the limited nature of a noncompetitive lease offer, have been confirmed in *Burglin v. Morton*, 527 F.2d 486 (9th Cir. 1976); *Duesing v. Udall*, 121 U.S.App.D.C. 370, 372–73, 350 F.2d 748, 750–51 (1965); and *Rowe v. Kleppe*, Civil No. 75–1152 (D.D.C., July 29, 1976).

No argument made by appellants is persuasive that these cases are distinguishable from those set out above. They are controlling, and the Department will follow them in these cases.

Appellants argue that in the simultaneous drawings in question the offeror became "irrevocably bound when his name was drawn and, reciprocally, the United States accepted the offer at the instant of the drawing." Appellant's brief in *In Re Arctic Slope/Western* at 18.

This argument has been previously rejected; *Schraier v. Hickel, supra*, also dealt with offers filed in a simultaneous drawing. The Circuit Court of Appeals stated:

Nor can it be successfully asserted that the Secretary exercises his discretion whether or not to lease when he gives notice for filing and processing applications. . . . Similarly the Secretary does not lose his ultimate authority because the Departmental officials assumed that appellant would be awarded a lease if he were found to qualify in all respects under pending regulation.

*Id.* at 85, 419 F.2d at 667.

Appellants argue that a contract was created in the fact that the offerors' first year's rental would be earned when the offer was first drawn, citing the notice for the drawing in which they were drawn first. All the Notices in question stated that if an offer was rejected, "the advance rental will be returned" to the offeror. *E. g.,* Ex. 13, 30 F.R. 11697 (September 11, 1965); Ex. 14, 31 F.R. 4741 (March 19, 1966). The change in policy from earlier drawings, *e. g.,* Ex. 12, 30 F.R. 898 (January 28, 1965), was designed to prevent the obstructive practice of withdrawal of first-drawn offers prior to lease execution. It was not designed to, nor did it in effect, make the drawing an acceptance of the offer, or constitute a waiver of the Secretary's discretion and a commitment to lease to the first drawn offeror.

The regulation governing noncompetitive lease *issuance* at the time of the drawings in question, 43 CFR 3123.5(b) (1966), provided, "The United States will indicate its acceptance of the lease offer, in whole or in part, and the issuance of the lease by the signature of the appropriate officer thereof in the space provided." No appellant asserts that the United States executed his offer. The Secretary may not ignore his own regulations. *McKay v. Wahlenmaier*, 96 U.S.App.D.C. 313, 321, 226 F.2d 35, 43 (1955). We reject the argument that a lease contract was entered into in the drawing. After the drawings in question, the Secretary retained the authority to reject the offers in response to the Native protests and refund the first year's rentals, but did not do so in response to pressure from the lease applicants that they be allowed to retain their priority.

Appellants argue at length that they expected that leases would issue to the successful drawees in these cases as a matter of course after the December 20, 1966, drawing, and that the first notice of the

possibility of a suspension was a November 28, 1966, press release. The Department's authority and discretion to lease or not to lease must be judged as of the time of lease execution, rather than the date the offer was filed or drawing notice was posted. *E. g., Hannifin v. Morton,* 444 F.2d 200 (10th Cir. 1971); *Wann v. Ickes,* 67 U.S.App.D.C. 291, 293, 92 F.2d 215, 217 (1937).

Appellants argue that the Secretary's failure to act on their offers has prejudiced them. Delay alone gives appellants no greater rights than they otherwise had. *McDade v. Morton,* 353 F.Supp. 1006 (D.D. C.1973), *aff'd,* 161 U.S.App.D.C. 237, 494 F.2d 1156 (1974). The noncompetitive oil and gas leasing regulations did not compel action on a lease offer within any particular time. 43 CFR 3123.5(b) (1966).

Those appellants who hold over-the-counter lease offers cannot avail themselves of the argument that the provision of the drawing notices regarding first year's rental created a contract. The over-the-counter leasing regulations at that time clearly document that an offer does not become a lease until executed by the appropriate officer, 43 CFR 3123.5(b) (1966), and an offer may be withdrawn without prejudice prior to lease issuance, 43 CFR 3123.5(a) (1966).

Appellants argue that although section 17(a) of the Mineral Leasing Act is permissive, section 17(c) is mandatory and requires lease issuance in these cases. Section 17(a) provides, "All lands subject to disposition under this chapter . . . may be leased by the Secretary." 30 U.S.C. § 226(a). Section 17(c) provides, "[T]he person first making application for the lease who is qualified . . . under this chapter shall be entitled to a lease of such lands without competitive bidding." 30 U.S.C. § 226(c). Section 17(c) mandates that the Secretary, when he decides to lease, do two things: issue the lease to the first qualified applicant; and (for lands not within any known geological structure of a producing oil or gas field) issue the lease without competitive bidding. Section 17(c) does not restrict his discretion to lease or not to lease; "the Secretary does not lose his ultimate authori-

ty because the Department[al] officials assumed that appellant would be awarded a lease if he were found to qualify . . ." *Schraier v. Hickel, supra* at 85, 419 F.2d at 667.

Next, appellants argue that the "land freeze" policy of the Department between 1966 and 1969 was arbitrary, capricious, and in excess of statutory authority. Appellants argue that lands must be withdrawn from mineral leasing by public land order promulgated under E.O. 10355, 17 F.R. 4831 (1952).

Appellants' supporting argument that E.O. 10355 "has equal application to exercises of discretion by the Secretary under 30 U.S.C. § 226" ignores the express language of E.O. 10355, "[a]ll orders issued by the Secretary of the Interior *under the authority of this order* shall be designated as public land orders and shall be submitted . . for filing and for publication in the Federal Register." *Udall v. Tallman, supra,* quoted by appellants on this issue, does not imply or hold that the Secretary's discretion not to lease under 30 U.S.C. § 226 can only be exercised by public land order; it is silent on the question. The implication of appellants' argument is that the Secretary must exercise his discretion in favor of leasing unless he withdraws the land under application from mineral leasing by public land order. In our opinion, the Secretary's discretion not to lease under section 17 of the Mineral Leasing Act may be exercised without formal withdrawal action when the public interest so dictates. The "land freeze" against which appellants complain was a proper exercise of discretion under section 17.

Appellants argue that the land freeze was arbitrary and capricious because the claims of Indian or aboriginal title did not "divest Congress of its plenary power to dispose of public lands in accordance with duly enacted laws." Appellants' brief in *Arctic Slope/Western* at 24. Appellants' statement on Congress' authority is correct; under section 17 the Department had the same *authority* to issue mineral leases after the Native protests were filed as before.

The existence of the authority, however, does not mandate lease issuance, as *Udall v. Tallman, supra,* made clear. The policy decision not to issue leases and to maintain the status of the public lands involved here while the question of Native rights was considered was, to paraphrase *Burglin v. Morton, supra* at 489, an *exercise* of discretion, not an abuse of discretion. *See Pease v. Udall, supra.*

Finally, appellants argue that the Secretary violated his responsibilities as trustee of the public domain in failing to lease to appellants, since (a) the title of the United States to these lands was never questioned; and (b) issuance of mineral *leases* could not have adversely affected aboriginal *title.* As discussed above, the fact that title to the land was not questioned only meant the Secretary had the authority to lease, not that he was required to do so. And while issuance of mineral leases would not jeopardize Native title, the title conveyed if Native rights were granted would have been devoid of what was potentially its most valuable resource. The Department is authorized to administer the public domain; its duties in this regard derive from Congressional exercise of its authority under the Property Clause of the Constitution, not any fiduciary-trust responsibilities. Under its authority the Department has, as in these cases, mediated conflicting demands upon the public domain. The exercise of the discretion granted by statute not to lease in these cases must be examined in light of that time. The "energy crisis" and Project Independence were not then with us. Today's urgency for domestic energy supplies cannot be weighed in judging the decisions of 1966. I reject appellants' argument that the Department violated its duties as administrator of the public domain in the cases at hand.

As the discussion above shows, I conclude that appellants' claim of a property interest in the lands to be conveyed does not withstand scrutiny. I conclude that appellants have not demonstrated error in the actions complained of. I therefore affirm the decisions of the Alaska State Office to issue conveyances to appellee Arctic Slope Regional Corporation, and dismiss the appeals of John T. Rowlett *et al.*

I further hereby reject appellants' pending noncompetitive oil and gas lease offers. By this action, the Department seeks to initiate the following policy. It is the policy of the Department of the Interior to expedite conveyances under ANCSA by rejecting pending noncompetitive oil and gas lease offers which conflict in whole or in part with conveyances under ANCSA at the time the lands to be conveyed are definitely identified. This policy is reached upon consideration of the following.

(a) It is the Department's view that section 22(i) of ANCSA, 43 U.S.C. § 1621(i), does not authorize the issuance of mineral leases under the Mineral Leasing Act on lands to be conveyed under ANCSA. This section states that the Department's authority to "grant leases" is not to be impaired on lands withdrawn for the protection of Native selection rights. In the statute itself, however, sections 11(a)(1), 11(a)(2), and 16(a) of ANCSA, 43 U.S.C. §§ 1610(a)(1), (a)(2), and 1615(a), expressly withdraw lands from mineral leasing under the Mineral Leasing Act. We conclude that Congress did not intend to authorize leasing under the Mineral Leasing Act in section 22(i) of ANCSA, 43 U.S.C. § 1621(i). The legislative history of ANCSA corroborates this conclusion. H.Rpt.92–746, 92d Cong., 1st Sess. (1972) at 45–46; U.S.Code Cong. & Admin.News 1971, p. 2192. Congress felt that leasing under the Mineral Leasing Act would be inconsistent with the purposes of ANCSA, and did not intend to include the authority to issue leases under the Mineral Leasing Act in section 22(i) of ANCSA. With the decision to issue conveyance, the pending offers come under the rule that an application may not be held pending availability of the land when approval of the application is prevented by a valid selection of record. 43 CFR 2091.1(b).

(b) Even if ANCSA did not preclude lease issuance, this policy would be established in the exercise of the discretion in section 17 of the Mineral Leasing Act, 30

U.S.C. § 226. I would not now exercise this discretion by amending the existing withdrawals from mineral leasing in order to lease in these cases. Issuance of leases on the pending offers would frustrate Congressional policy by denying Alaska Native corporations the full benefit of the resources in the lands which Congress intended to be conveyed to them. H.Rpt.92–523, 92d Cong., 1st Sess. (1971) at 5.

(c) Even if the Department is not barred from issuing mineral leases, issuance of leases on the pending offers at this juncture would nullify the years of policy decision and withdrawals preventing lease issuance in order to protect the rights of Alaska Natives.

(d) The oil and gas lease offerors have been granted protection commensurate with the nature of their interest as first qualified offerors by the Department's suspension of their offers. In light of the discussion of the nature of the offerors' interest above, the Department has safeguarded the offerors' status as first qualified applicants during the intervening years of title uncertainty. The offerors are not due greater deference because the Department suspended, rather than rejected, their applications during the period of the withdrawals in aid of legislation, and after Congress resolved the Native protests by extinguishing aboriginal title and all claims of aboriginal title in ANCSA. The suspension policy has jointly served the interests of the Alaska Natives by allowing the Department to meet fully their rights under ANCSA, and the interests of those first-qualified applicants whose lease offers cover lands not selected. This statement is not intended, however, to imply that the Department will exercise or has exercised its discretion to lease lands not conveyed.

I have exercised jurisdiction over these cases in order to establish this policy and adjudicate the appeals, and in order to resolve the following questions as quickly and fairly as possible.

This action will obviate the delay attendant on exhaustion of the appeal remedies in the Department. In accordance with the policy stated above, oil and gas leases will not be issued as a consequence of administrative appeals; the appeals requesting lease issuance are hereby rejected. In addition, in the cases to which this Order applies, the appellant oil and gas lease offerors assert an interest which is not a "property interest in land." *Schraier v. Hickel, supra; Duesing v. Udall,* 121 U.S.App.D.C. 370, 372–73, 350 F.2d 748, 750–51 (1965); *Rowe v. Kleppe,* Civil No. 75–1152 (D.D.C., July 29, 1976). An oil and gas lease offeror thus does not have standing under 43 CFR 4.902 to appeal to ANCAB a BLM decision to issue conveyance. This decision will avoid delay and expense to both the offerors and the Natives in the Department's appeal process, time and expense which the policy stated in this Order renders unnecessary.

This decision will avoid attempts to invoke the jurisdiction of the Interior Board of Land Appeals by appealing the rejection of the oil and gas lease offers separately from the appeal of the decisions to issue conveyance. The Board of Land Appeals has such appeal authority in the regular oil and gas lease offer case, 43 CFR 4.1(3). Since August 6, 1975, however, appeals in "matters relating to land selection arising under [ANCSA]" lie with ANCAB. 43 CFR 4.1(5), 40 F.R. 33172 (1975). This Order will obviate the confusion and delay of multiple appeals, determinations of jurisdiction under this regulation, and case transfers under 43 CFR 4.901(c).

The Department's administrative remedies afford administrative due process to those who hold or assert property interests. Bypassing these remedies will not violate any procedural due process rights of the offerors. As discussed above, appellant oil and gas lease offerors, whether before ANCAB or IBLA, have no property interest which invokes the hearing requirements of due process, and which would require the application of the Department's hearing regulations, *e. g.,* 43 CFR 4.420–452. Compare *Burglin v. Morton, supra* at 488, with *Pence v. Kleppe,* 529 F.2d 135 (9th Cir. 1976). In addition, in this case I find no

factual dispute which would alter the outcome of the cases, so that the appeals boards' discretionary authority to order hearings in cases containing factual disputes will not be necessary. 43 CFR 4.415, 43 CFR 4.911(c).

Some appellants' offers do not conflict in any part with the conveyances at issue here. Their appeals are dismissed, but their lease offers are not hereby rejected.

This decision constitutes the final action of the Department of the Interior in these cases. The advance rentals which accompanied the applications will be refunded pursuant to the issuance of this decision.

H. Gregory Austin
Acting Secretary of the Interior

APPENDIX A

| APPLICANT | SERIAL # |
|---|---|
| Fricke, Jack & Sczudlo, Walter | F–260 |
| | F–275 |
| | F–278 |
| Breaid, Denny & Lafferty, Charles | F–185 |
| | F–223 |
| | F–226 |
| | F–228 |
| Morris, Elkan | F–279 |
| Rowe, Richard & Gaudianne, Dan | F–183 |
| | F–273 |
| Rowe, Richard & Samay, Edwin | F–270 |
| New State Finance, Inc. | F–265 |
| | F–277 |
| First National Bank of Fairbanks, Executor of Estate of Robert Briggs, deceased | F–195 |
| Ramras, Dan | F–227 |
| | F–271 |
| | F–276 |
| Collins, Robert J. & Hannaman, Len | F–224 |
| | F–231 |
| | F–238 |
| | F–264 |
| | F–248 |
| | F–250 |
| Wigger, Walter & Wigger, Winnifred | F–220 |
| | F–221 |
| | F–222 |
| | F–229 |
| | F–235 |
| | F–240 |
| | F–253 |
| | F–266 |

| APPLICANT | SERIAL # |
|---|---|
| | F–268 |
| | F–269 |
| | F–272 |
| | F–274 |
| Greimann, Paul, Jr. | F–247 |
| | F–249 |
| Hummel, Katherine & Novosel, Frank | F–353 |
| Joiner, E. B. | F–280 |
| Anderson, G. M. | F–196 |
| | F–200 |
| Appling, J. B. | F–173 |
| Ard, Saradell | F–320 |
| Arrestad, Burton | F–355 |
| Ascher, Albert | F–334 |
| Babinec, Joseph | F–285 |
| Christensen, Quinton | F–306 |
| Dalco Oil Company | F–202 |
| Drumheller, G. H. | F–184 |
| Edwards, Juana | F–251 |
| | F–262 |
| Fogelson, Gayle | F–169 |
| | F–170 |
| | F–172 |
| | F–203 |
| Gain, Kenneth | F–182 |
| | F–230 |
| | F–252 |
| Green, Otto | F–177 |
| Hamann, Mathew | F–181 |
| Holm, Ernest | F–179 |
| Johnson, Herbert | F–288 |
| Kiltz, R. C. | F–283 |
| Machado, Frances | F–357 |
| Moore, James | F–197 |
| Moore, Thomas | F–303 |
| Rankin, Kenneth | F–180 |
| Schiff, H. G. | F–171 |
| | F–198 |
| Tweedy, W. A. | F–343 |
| Vanderweele, James | F–316 |
| Wargo, E. H. | F–356 |
| Warren, Richard | F–286 |
| | F–287 |
| | F–284 |
| Wien, Merrill & Millard, Douglas | F–225 |
| Winn, Warren | F–199 |
| Zaegel, W. | F–241 |
| | F–267 |
| Zawaki, F. | F–245 |
| Greimann, Paul, Sr. | F–244 |
| Greimann, Flora | F–246 |

## APPENDIX B

| APPLICANT | SERIAL # |
|---|---|
| Cox, Winston L., Estate of | F–5624 |
| Cranston, Earl M. & Asamera Oil, Inc. | F–2346 |
|  | F–2347 |
| Hoefle, R. C. & Asamera Oil, Inc. | F–2328 |
|  | F–2329 |
|  | F–2322 |
| Rowlett, John | F–2829 |
|  | F–2830 |
|  | F–2834 |
|  | F–2835 |
|  | F–2838 |
|  | F–2839 |
|  | F–2831 |
|  | F–2836 |
|  | F–2840 |
|  | F–2842 |
|  | F–2843 |
|  | F–2844 |
|  | F–2845 |
|  | F–2846 |
|  | F–2847 |
|  | F–2865 |
|  | F–2893 |
|  | F–2894 |
|  | F–2895 |
|  | F–2899 |
|  | F–2900 |
|  | F–2901 |
|  | F–2902 |
|  | F–2904 |
|  | F–2905 |
|  | F–2906 |
| Thompson, J. | F–2584 |
|  | F–2585 |
|  | F–2586 |
|  | F–2587 |
|  | F–2588 |
|  | F–2589 |
|  | F–2590 |
|  | F–2591 |
|  | F–2592 |
|  | F–2593 |
|  | F–2578 |
|  | F–2579 |
|  | F–2580 |
|  | F–2581 |
|  | F–2582 |
| Harkabus, Edward J. | F–2787 |
| Rowley, Donald R. | F–2787 |
| Swart, Otis | F–6467 |
|  | F–6468 |
|  | F–7545 |
|  | F–7546 |
|  | F–7547 |
|  | F–7548 |
|  | F–7549 |
| Butrovich, John, Jr. | F–10577 |
| Schlotfeldt, Leo A. | F–2949 |

| APPLICANT | SERIAL # |
|---|---|
| Gunther, Robert | F–10583 |
|  | F–10584 |
| Waugaman, William I. | F–3003 |
|  | F–3004 |
|  | F–3006 |
| Bozeman, Glenn | F–1916 |
|  | F–1917 |
|  | F–1918 |
| Haggland, Paul | F–1923 |
|  | F–1925 |
|  | F–1926 |
|  | F–2260 |
|  | F–2262 |
|  | F–2261 |
|  | F–1928 |
| Toombs, B. G. & Barbara J. | F–1643 |
|  | F–1644 |
|  | F–1645 |
|  | F–1646 |
| Marquiss, Robert C. | F–10585 |
| Chandler, Don | F–1912 |
| Tenoil, a partnership of Linck, L. S. & Stroecker, William G. | F–2982 |
|  | F–2983 |
|  | F–2984 |
|  | F–2986 |
|  | F–2987 |
|  | F–2988 |
|  | F–2989 |
|  | F–2992 |
|  | F–2999 |
| Gavora, Vladimir | F–1939 |
|  | F–1941 |
|  | F–1942 |
|  | F–1943 |
|  | F–1945 |
|  | F–2257 |
|  | F–2258 |
|  | F–4211 |
|  | F–11183 |
| B & B Co., Inc., Bozeman, Glenn, Meyeres, Bud & Novosel, Frank J. | F–2269 |
|  | F–2271 |
|  | F–2272 |
|  | F–2278 |
|  | F–2283 |
|  | F–4457 |
| Meyeres, Bud & Bozeman, Glenn | F–2049 |
| Breaid, Denny, Lafferty, Charles, & Kohler, Ray | F–7518 |
|  | F–7519 |
|  | F–7520 |
|  | F–7521 |
| Rogge, Eugene | F–6589 |
| Stroecker, William G. | F–6414 |
|  | F–6415 |
|  | F–6417 |
|  | F–6418 |
| Linck, Lee S. | F–2958 |
|  | F–2959 |
| Antweil, Mary Frances | F–2167 |

| APPLICANT | SERIAL # |
|---|---|
| ▮▮▮▮▮▮ | F–2169 |
|  | F–2170 |
|  | F–2171 |
|  | F–2172 |
|  | F–2630 |
|  | F–2631 |
|  | F–2632 |
| Bayless, Howard | F–11667 |
|  | F–11668 |
| Bush, William | F–6539 |
|  | F–6547 |
|  | F–6548 |
| Canon, James W. | F–7217 |
|  | F–7218 |
|  | F–7219 |
|  | F–7220 |
|  | F–7222 |
|  | F–7223 |
|  | F–7224 |
|  | F–7225 |
|  | F–7226 |
|  | F–7227 |
| Gain, Ken, Martindale, Frances M. & Niemeyer, Ruth I. | F–9394 |
| Condurochi, Constantin | F–4688 |
| Johnson, August | F–2141 |
|  | F–2143 |
|  | F–2145 |
|  | F–2146 |
| Johnson, Rose Mary, Jackson, Susan & Kenigy, Alfred | F–7602 |
| Kennedy, W. | F–3127 |
|  | F–3128 |
|  | F–3129 |
|  | F–3130 |
|  | F–3118 |
|  | F–3119 |
|  | F–3121 |
|  | F–3122 |
|  | F–3125 |
|  | F–3126 |
|  | F–3132 |
|  | F–3133 |
|  | F–3134 |
|  | F–3135 |
|  | F–3076 |
|  | F–3077 |
| Rockar, Yolana, Johnson, Rose Mary, Kenigy, Alfred, Mane, Helen, Ambrose, Naomi, Martin, Willie W. & Marshall, Stella | F–7604 |
| Rowe, Richard & Gaudiane, Daniel | F–3907 |

| APPLICANT | SERIAL # |
|---|---|
| Sexton, William | F–6551 |
|  | F–6552 |
| Snider, William | F–7098 |
| Taku Development Corp. | F–2184 |
|  | F–2185 |
|  | F–2189 |
|  | F–2192 |
| Wien, Merrill & Millard, Douglas G. | F–11053 |
|  | F–11052 |
| Wien, Merrill, Millard, Douglas G. & Wolf, Estelle | F–1996 |
|  | F–1997 |
|  | F–1999 |
|  | F–2000 |
|  | F–2001 |
|  | F–2002 |
|  | F–2003 |
|  | F–2005 |
|  | F–2007 |
|  | F–2008 |
|  | F–3914 |
| Contento, John | F–1933 |
|  | F–1935 |
|  | F–1936 |
|  | F–1938 |
|  | F–2252 |
|  | F–2253 |
| Carpenter, Morris | F–6500 |
|  | F–6501 |
|  | F–6502 |
|  | F–6511 |
|  | F–6512 |
|  | F–6553 |
|  | F–6556 |
|  | F–6560 |
| Fielding, Al M. & Bateman, Herman L. | F–2766 |
| Goodrich, J., Brennan, John J., & Mulcahy, Edward P. | F–2188 |
| Gilbertson, J. | F–5737 |
| Gregory, Richard | F–5717 |
|  | F–5716 |
| Gavora, Vladimir | F–4208 |
|  | F–4209 |
|  | F–4312 |
| Arndt, E. M. | F–5473 |
|  | F–5476 |
| Holmes, Orval | F–8967 |
| Hall, Duane | F–8987 |
| Inexco Oil Co. | F–1826 |
|  | F–1827 |
|  | F–1828 |
|  | F–1830 |
|  | F–1831 |
|  | F–1832 |
|  | F–1833 |
|  | F–1834 |
|  | F–1835 |

| APPLICANT | SERIAL # |
|---|---|
|  | F–1836 |
|  | F–1837 |
|  | F–1838 |
|  | F–1839 |
|  | F–1840 |
|  | F–1841 |
|  | F–1842 |
|  | F–1855 |
|  | F–1854 |
|  | F–1887 |
|  | F–1888 |
|  | F–1889 |
|  | F–1894 |
|  | F–1895 |
|  | F–1896 |
|  | F–1897 |
|  | F–1898 |
|  | F–1899 |
|  | F–1900 |
|  | F–1901 |
|  | F–1907 |
| Brennan, John J., Marchant, E. Z., & Mulcahy, Edward P. | F–1677 |
| Nicolini, W. | F–4741 |
|  | F–4743 |
|  | F–4751 |
| Brennan, John J., O'Niell, Edward, & Mulcahy, Edward P. | F–2028 |
| Pederson, Roy O. | F–5408 |
| Rowlett, John T. & Alan J. Antweil | F–2742 |
|  | F–3007 |
|  | F–3008 |
| Schlotfeldt, Leo | F–4538 |
|  | F–4541 |
| Sexton, William D. | F–5721 |
| Simon, Milton S. | F–2771 |
|  | F–2773 |
| Stroecker, Robert | F–8970 |
| Wiley, Robert | F–4224 |
| Witmer, J. & Connell, Thomas | F–7538 |
|  | F–7539 |
|  | F–7540 |
|  | F–7541 |
|  | F–7543 |
|  | F–7946 |
|  | F–7947 |
|  | F–7948 |
|  | F–7950 |
|  | F–7952 |
|  | F–7953 |
| Zboyovski, Andrew | F–9022 |
| Weeks, Marion S. | F–9037 |
| Stroecker, William & Butrovich, John, Jr. | F–8944 |
| Butrovich, John, Jr. & Stroecker, Robert | F–8948 |

| APPLICANT | SERIAL # |
|---|---|
| Future, Inc. | F–8980 |
|  | F–8985 |
|  | F–8981 |
| Cox, Winston, L., estate of | F–3810 |
|  | F–3811 |
|  | F–3812 |
| Baker, Shirley T. | F–3019 |
|  | F–3020 |
|  | F–3021 |
|  | F–3022 |
|  | F–3023 |
|  | F–3024 |
| Hoefle, R. C. | F–3046 |
|  | F–3047 |
|  | F–3048 |
|  | F–3049 |
|  | F–3050 |
|  | F–3051 |
|  | F–3052 |
|  | F–3053 |
|  | F–3054 |
|  | F–3055 |
|  | F–3056 |
| Brennan, John J. Mulcahy, Edward P., Fielding, Al M., & Bateman, Herman L. | F–2182 |
|  | F–2766 |
| Bland, Wiley R., Brennan, John J., & Mulcahy, Edward P. | F–2769 |
| Allen, Monte | F–2776 |
|  | F–2775 |
| Burglin, Cliff | F–7141 |
|  | F–7142 |
|  | F–7143 |
|  | F–7144 |
|  | F–7145 |
|  | F–7146 |
|  | F–8195 |
|  | F–8196 |
|  | F–8198 |
|  | F–8230 |
|  | F–8231 |
|  | F–8233 |
|  | F–8557 |
|  | F–8558 |
|  | F–8559 |
|  | F–8647 |
| Brennan, John J. | F–2437 |
|  | F–2510 |
|  | F–2545 |
|  | F–2546 |
|  | F–2554 |
|  | F–2555 |
|  | F–2556 |
|  | F–2558 |
| Stewart, Betty | F–8949 |
| Hanson, Lowell & Newlin, C. J. | F–8955 |
|  | F–8956 |
| Clasby, Charles & Ethyl | F–9070 |

| APPLICANT | SERIAL # |
|---|---|
| Anderson, Larry | F–4494 |
| | F–4495 |
| | F–4499 |
| Bland, Wiley | F–2778 |
| Bailey, Ralph | F–5419 |
| Burnett, Wally | F–5815 |
| | F–5816 |
| | F–5820 |
| | F–5821 |
| | F–5822 |
| | F–5824 |
| | F–5825 |
| | F–5826 |
| | F–5827 |
| Miklautsch, T. J. & Burnett, R. | F–6839 |
| | F–6840 |
| | F–6845 |
| | F–6846 |
| | F–6848 |
| | F–6849 |
| | F–6850 |
| | F–6851 |
| | F–6852 |
| | F–6909 |
| Caylor, James W. | F–6930 |
| | F–6931 |
| Contento, John | F–7508 |
| Daniel, Marshall, Brennan, John J. & Mulcahy, Edward P. | F–1671 |