Richard ROWE, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 572–81L.

United States Claims Court.

Nov. 30, 1983.

Quinn O'Connell, Washington, D.C., attorney of record, for plaintiffs; Ernest C. Baynard, III and Connole & O'Connell, Washington, D.C., of counsel.

James E. Brookshire, Washington, D.C., with whom was Asst. Atty. Gen. Carol E. Dinkins, Washington, D.C., for defendant; David Thomas, Div. of Energy and Resources, Dept. of the Interior, and Larry Corcoran, Land and Natural Resources Div., Dept. of Justice, Washington, D.C., of counsel.

OPINION

WIESE, Judge:

This case is before the court on plaintiffs' motion for partial summary judgment and defendant's cross-motion for summary judgment. Plaintiffs are individuals who submitted offers to lease public lands on the "North Slope" of Alaska for oil and gas exploration. The Secretary of the Department of the Interior ultimately rejected these offers and, pursuant to the Alaska

Native Claims Settlement Act, 43 U.S.C. §§ 1601–1628 (1976 & Supp. IV 1980), conveyed the lands in question to the Artic Slope Regional Corporation—a congressionally-created Native corporation [1]—in settlement of aboriginal claims.

Plaintiffs contend that these conveyances by the Secretary breached an implied-in-fact contract to issue leases to them and, on that basis, they now seek contract damages here. Alternatively, they urge that the Government is estopped to deny the existence of a contract to lease. Finally, they argue that the delayed return of their bid deposits amounted to a taking of their property for which compensation is now owing pursuant to the Fifth Amendment. Because we agree with the Government that plaintiffs are precluded from relitigating the existence of their contractual rights to the leases, we do not reexamine the merits of the contract contentions. As to the taking claim, we find it to be without any support in the facts of the case. Therefore, we grant the Government's motion for summary judgment.

### FACTS

#### 1.

The procedural history of the case spans more than seven years and is recounted in numerous pages of reported opinion. The litigation began in late 1976 when plaintiffs appealed to the Alaska Native Claims Appeal Board [2] to set aside a then recent decision of the Bureau of Land Management to convey the disputed lands to the Arctic Slope Regional Corporation. The Secretary assumed original jurisdiction over these appeals and, in a decision of November 24, 1976 ruled, *inter alia,* (i) that the convey-

ance was proper, (ii) that plaintiffs had acquired no property interests in the lands conveyed, and (iii) that their lease offers (which had been held in abeyance pending resolution of the Native land claims) were now rejected.

Plaintiffs then sued the United States, the Secretary, and the Regional Corporation in the United States District Court for the District of Alaska. In that action, plaintiffs sought to compel the Secretary to convey the lands subject to their claimed leasehold interests. Among other theories, they alleged claims based upon breach of contract arising from the failure of the Secretary to execute leases. *See Rowe v. United States,* 464 F.Supp. 1060, 1063 n. 7 (D.Alaska 1979). The district court, on cross-motions for summary judgment, rejected all of plaintiffs' claims. *Id.* at 1080. On appeal, the United States Court of Appeals for the Ninth Circuit affirmed the district court's denial of injunctive relief but reversed on the contract claims, holding that because the damages claimed were in excess of $10,-000, jurisdiction over those claims was exclusively within the province of the United States Claims Court under the Tucker Act, 28 U.S.C. §§ 1346, 1491 (Supp. IV 1980), as amended by Act of April 2, 1982, Pub.L. No. 97–164 § 133, 96 Stat. 39. *Rowe v. United States,* 633 F.2d 799, 800 (9th Cir.1980), *cert. denied,* 451 U.S. 970, 101 S.Ct. 2047, 68 L.Ed.2d 349 (1981). The court of appeals remanded to the district court and that court, in turn, transferred the case here.

#### 2.

Both the Secretary's decision and the district court opinion recite the facts underlying this dispute in great detail. *See Rowe,*

---

**1.** The Alaska Native Claims Settlement Act established twelve Native Regional Corporations, of which the Arctic Slope Regional Corporation was one. The Act also established smaller village corporations. Both the Village and Regional Corporations were to manage the money and land granted the Natives under the Act. The Village Corporations were to receive patents to the surface estate, while the Regional Corporations were to be granted patents to the

subsurface estate. *See Rowe v. United States,* 464 F.Supp. 1060, 1068 (D.Alaska 1979).

**2.** The Alaska Native Claims Appeal Board was appointed by the Secretary to consider and render final decisions upon "appeals to the head of the Department from findings of fact or decisions rendered by Departmental officials in matters relating to land selection arising under the Alaska Native Claims Settlement Act * *." 40 Fed.Reg. 33,172 (1975).

464 F.Supp. at 1063–69, 1077–78, 1081–82.[3] We therefore repeat here only so much of that history as is necessary to an understanding of our decision.

The Mineral Lands Leasing Act of 1920, 30 U.S.C. §§ 181–263 (1976 & Supp. V 1981), grants the Secretary of Interior discretionary authority to issue oil and gas leases on Federal lands. Section 226(c) of the Act (the provision relevant to the dispute) provided (as of 1966) that the leasing of lands "not within any known geological structure of a producing oil or gas field" was to proceed on a non-competitive, first-qualified applicant basis. 30 U.S.C. § 226(c) (1976). Under the procedures that were followed here, determination of the first-qualified applicant involved what is referred to as the "simultaneous filing" method. That is, upon the publication of notice by the Secretary of an intention to lease, all offers received on or before a certain date are regarded as having been simultaneously filed. Competition among applicants for the same tract of land is then resolved by a drawing; the applicant so chosen becomes the so-called "first-qualified" applicant or offeror for a particular tract.

In the simultaneous filing procedures as here described, the practice had been to require applicants for public lands to deposit no more than a ten dollar filing fee with their offers. In consequence of this nominal sum, speculative practices were encouraged. Often bids were tendered solely with the expectation of selling, for a profit, any first-drawn status that might result. And, where the hoped-for sale was not achieved, the procedures permitted withdrawal before a lease was executed, *i.e.*, without penalty.

In order to curb this abusive practice, the Interior Department decided that applicants for leases on the North Slope of Alaska would have to "cover their bets." *See Rowe,* 464 F.Supp. at 1078. This was accomplished by requiring offerors to submit with each application a check in the amount of the first year's rental of the tract for which they applied. The application also stipulated that an offeror's signature on the drawing card would indicate his agreement to be bound to lease if a lease were issued to him. These provisions, first announced in 1965, were included as part of the leasing notice pertinent to this case, namely, the Opening Notice of September 23, 1966. 31 Fed.Reg. 12575 (1966).

That notice further provided that, while an applicant could withdraw his offer prior to the drawing and receive a refund of the deposited "rent," once the drawing had occurred the first-drawn applicant would no longer be permitted to withdraw and receive a refund. Only in the event the Secretary rejected the lease offer would a refund be made. *Id.* The drawing to determine priority was set for December 20, 1966. Plaintiffs signed and mailed their entry cards with the required rental deposits.

Shortly after the Opening Notice was published, Native organizations, long opposed to the Government's land disposition policies, filed suit to enjoin the issuance of any oil and gas leases for North Slope lands. Their position was that they held aboriginal title to these lands and to the resources they contained. In response, the Secretary decided to postpone issuing any leases until the Native claims were resolved. The Secretary's decision was published by various means (including press releases, public notices, and the Federal Register) between November 28 and December 8, 1966. Bureau of Land Management records indicate that, of the 364 offers withdrawn prior to the drawing, the majority were withdrawn after November 28, 1966.

The drawing proceeded as scheduled. Plaintiffs won first-drawn priorities, but, as had been explained in the previous publications, no leases were then executed. Some plaintiffs tried at this point to withdraw their offers and obtain refunds, but the Bureau denied these requests.

**3.** The November 24, 1976 decision of the Secretary appears in full as an Appendix to the district court opinion, 464 F.Supp. at 1080–89.

Following the Atlantic Richfield Company's discovery of large deposits of oil at Prudhoe Bay in 1968, the Secretary issued Public Land Order 4582, 34 Fed.Reg. 1025 (1969), withdrawing, for a two-year period, all Alaska public lands from further mineral leasing. As the order explained, this action was taken "for the determination and protection of the rights of the native Aleuts, Eskimos, and Indians of Alaska." At the same time, however, the Secretary did not then reject any of the earlier-qualified lease offers—this in response to the "intense interest" expressed by these offerors in maintaining their first-qualified status in the withdrawn lands pending resolution of the Native claims. 464 F.Supp. at 1082.

In December 1971 Congress enacted the Alaska Native Claims Settlement Act, Pub.L. No. 92–203, 85 Stat. 688 (codified at 43 U.S.C. §§ 1601–1628 (1976 & Supp. IV 1980)), which extinguished all claims based upon aboriginal title and, in return, granted the Natives, acting through the Regional and Village Corporations, monetary consideration and the right to select lands from among those withdrawn under Public Land Order 4582. It was through this statutory selection process that the lands in the North Slope area (for which plaintiffs had filed) came to be required for the satisfaction of Native claims.

As noted previously, in 1976 the Bureau approved an interim conveyance of this land to the Arctic Slope Regional Corporation. Plaintiffs' administrative appeal followed. Subsequently, upon the Secretary's issuance of his decision affirming the conveyance and simultaneously rejecting plaintiffs' offers, the Department on January 24, 1977, issued checks refunding the rental deposits to some plaintiffs. Several of those who received these checks returned them to the Department. Plaintiffs then brought suit in the district court.

## DISCUSSION

### 1. *Issue Preclusion*

The Government argues that plaintiffs are precluded from relitigating their contract claims here because the district court had previously determined that no contract to lease existed between the Secretary and the plaintiffs. The Government cites the Restatement (Second) of Judgments to support its position: "When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." Restatement (Second) of Judgments § 27 (1982).

In response, plaintiffs point to the fact that the court of appeals ordered dismissal or transfer of their contract damage claims; hence, they reason that the only issue properly before the district court was the propriety of the Secretary's decision rejecting their lease offers, *i.e.*, whether that action amounted to an abuse of administrative discretion. If the district court lacked jurisdiction over the contract claims, plaintiffs' argument continues, it need not—indeed could not—have decided the contract issue; therefore, preclusion is inappropriate.

Moreover, plaintiffs go on to say that the contract theory which they are asserting here (damages for breach of an implied-in-fact contract) is factually and conceptually distinct from the contract relief they sought in the district court (injunctive relief to enforce the obligations of an express contract); hence, they contend, the present question raises matters neither actually litigated before the district court nor necessarily embraced by that court's decision.

Finally, plaintiffs make the argument that, even assuming a commonality of operative facts (between the contract argument raised in the district court and that presented here) nevertheless, preclusion would be inappropriate because the evidentiary showing required in order to prevail on a claim for specific performance against the United States (to compel recognition of a leasehold) is significantly more rigorous than a damages remedy would demand. The contentions cannot be sustained.

### A.

The general rule of res judicata precludes relitigation between the same parties of matters actually litigated and decided as well as those that *should* have been raised in the prior action. *Commissioner v. Sunnen,* 333 U.S. 591, 597, 68 S.Ct. 715, 719, 92 L.Ed. 898 (1948). As the Restatement (Second) of Judgments expresses it, the dimensions of a claim for purposes of bar, include "all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction * * * out of which the action arose." Restatement (Second) of Judgments § 24(1) (1982). Accordingly, since the facts and the parties here are identical to those in the action before the district court, application of this usual rule would require dismissal of the present action since it seeks nothing more than a different remedy. What saves the plaintiffs from this automatic foreclosure, however, is the fact that they could not have obtained full monetary relief on their contract claims in the district court. That is to say, the rule of preclusion, as the Restatement (Second) of Judgments points out, "is narrower when a procedural system in fact does not permit the plaintiff to claim all possible remedies in one action * * *." Restatement (Second) of Judgments § 25, comment *f* and § 26(c) (1982); Wright, Miller & Cooper, *Federal Practice and Procedure* § 4412 (1981).

But, while the monetary limitations on the district court's Tucker Act jurisdiction now dictate—as a matter of fundamental fairness—that plaintiffs be permitted to pursue their contract claims in this forum, it does not follow that those claims—or, more specifically, the issues of fact and law upon which they depend—are automatically entitled to a second airing here. On the contrary, to the extent those issues were litigated and determined by the district court as an essential part of the matters properly raised there, the adjudication of those issues is final and binding in all subsequent actions between these same parties. *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979).

What it comes down to then is (i) whether the facts upon which the present contract demands are grounded were similarly urged before the district court as a basis for the injunctive relief that was sought there and, if so, (ii) whether, in its assessment of those facts, the district court made determinations of law with respect to which a favorable decision for the plaintiffs in this court would be logically inconsistent.

### B.

Among the grounds for injunctive relief which plaintiffs urged before the district court was the contention that their interests in the disputed land amounted to "valid existing rights" within the meaning of Section 14 of the Alaska Native Claims Settlement Act and, further, that it was the Secretary's duty, pursuant to that same section, to have recognized and preserved those rights in the patents conveying the land. The referenced section, now 43 U.S.C. § 1613(g) (referred to by the parties as the "savings clause"), provides, *inter alia,* that "All conveyances made pursuant to this chapter shall be subject to valid existing rights * * * [and] [w]here, prior to patent of any land or minerals under this chapter, a lease, contract, permit, right-of-way, or easement * * * has been issued for the surface or minerals covered under such patent, the patent shall contain provisions making it subject to [such interest]."

In support of their claims to protectable interests in the lands conveyed (their claims to "valid existing rights"), plaintiffs relied upon the bidding procedures in which they had participated, their contention being that through those procedures the essential elements of a contract to lease had been established. The district court flatly rejected this argument. 464 F.Supp. at 1078.

Now the contention is made that under the previously referenced "savings" section of the Alaska Native Claims Settlement Act, the district court was only obliged to inquire into the existence of an express contract and, hence, actually gave no consideration to whether an implied-in-fact contract had ever been created. In making

this argument, plaintiffs attach much weight to the use of the word "issued" in the savings clause. They read that word as a manifestation of the drafters' intent to restrict application of the clause to those interests in land whose existence could be proved by a formal writing—a requirement which plaintiffs now say their alleged contract to lease did not satisfy.

Plaintiffs have offered the court no support for the restrictive reading of the Alaska Native Claims Settlement Act which they urge. Such references to the same point as do appear in the district court opinion are distinctly the other way. *See Rowe*, 464 F.Supp. at 1077 n. 90 (quoting legislative history to the effect that the savings clause embraced "[a]ll valid existing rights, including inchoate rights of entrymen and mineral locators"). The point warrants no further discussion.

Plaintiffs' other point—that their contract claims were tested only in light of their provability through a writing and not as a matter of promissory intent demonstrated through conduct—similarly cannot stand. A reading of the district court opinion makes clear that the court in fact considered and rejected the specific claim that the Secretary's acceptance of nonrefundable bid deposits obligated him to issue leases to plaintiffs. In essence, this is the same argument asserted here. All plaintiffs have done is to apply to it a new label in an attempt to convince this court that they are advancing an entirely new theory of recovery.

■ To constitute an implied-in-fact contract, the circumstances of the case must evidence the equivalent of mutual consent to be bound. *J.C. Pittman & Sons, Inc. v. United States*, 161 Ct.Cl. 701, 705, 317 F.2d 366, 368 (1963). It is precisely this element of proof—*mutual* manifestations of assent—which the district court found wanting. Granted, that court did not make the point expressly, yet that is the unmistak-

able thrust of its analysis: that there was no support for the notion that the Government, in insisting upon offers accompanied by nonrefundable bid deposits, thereby signified its intention to accept such offers simultaneously with their selection or, equally important here, that plaintiffs could reasonably have so understood.

Among the points considered by the district court in its evaluation and rejection of plaintiffs' contract claims were these: (i) that the Opening Notice published in the Federal Register made clear that the filing of an application would signify only a bidder's willingness to be bound to a lease; not the Secretary's,[4] (ii) that the retention of administrative discretion (as to whether or not to lease) was further evidenced by that language in the opening notice which demonstrated that rejection of an offer could proceed even *after* a successful drawee had been determined,[5] and (iii) that consistent with the language of the notice, the regulations in force at that time explicitly stated that the acceptance of a lease offer would be indicated by the exclusive method of the Secretary's signature on the lease form.

While there are still other factors upon which the district court relied in deciding against plaintiffs' claims to an enforceable contract to lease, these need not be recounted here. It is enough to say of all that was considered, that plaintiffs' claims were defeated, not because they lacked the formality of an express contract, but rather because of the absence in the controlling facts of any basis for concluding that the Government had ever agreed to a contract. The Secretary, the district court determined, never relinquished his discretion to lease. *Rowe*, 464 F.Supp. at 1079. In short, the remedy of an injunction was denied plaintiffs for lack of *any* contract—express or implied.

Inasmuch as the existence of an implied-in-fact contract was actually and necessari-

---

4. The notices uniformly recited in paragraph (c) the following: "By signing and submitting the entry card, the applicant agrees that he will be bound to a lease * * * if such a lease is issued to him." 31 Fed.Reg. 12575 (1966) (emphasis added).

5. *Id.* at Paragraph (d).

ly determined unfavorably to plaintiffs by the district court, they are precluded from relitigating that issue here.

Plaintiffs' alternative theory of recovery based upon contract by estoppel is likewise precluded. The allegation that the Government is estopped to deny the existence of a contract because it accepted the benefits of a contract to lease (*i.e.,* the rental payments) is no more than another label for the same substantive argument just addressed.

### C.

Finally, plaintiffs argue that issue preclusion is inappropriate here because they were subject to a higher burden of proof in their suit before the district court than that to which they would be held by this court. They maintain that, in order to have overcome the Secretary's unrestricted conveyance of the land, their suit in the district court would have required proof showing an abuse of administrative discretion while, to recover damages here, they need only prove a contract by a preponderance of the evidence.

Clearly, the principles of fairness underlying the rule of issue preclusion are not served where a party is prevented from relitigating an issue simply because, in a prior suit, he was unable to overcome a stringent burden—"beyond a reasonable doubt," for instance—when in the subsequent action he would only need to prevail by a preponderance of the evidence. *See* Restatement (Second) of Judgments § 28(4) (1982). However, plaintiffs' argument misconstrues the nature of the analysis which the district court was required by the Alaska Native Claims Settlement Act to undertake.

█ As discussed earlier, the Act's savings clause protects against the loss of valid existing rights when lands are conveyed to the Natives. It was not, however, a matter of the Secretary's discretion whether or not to recognize such rights. Rather, if through prior contracts or otherwise, the land had become burdened with a valid existing right, then the Secretary was required by the statute to convey the land subject to it. From this analysis it becomes clear that the district court decided the contract issue as a matter of historical fact—thus subject to the same preponderance rule which would be applicable here—and not as a matter of Secretarial discretion.[6] Because the burden of proof upon plaintiffs was the same in the prior action as it would be in the present one, there is no basis upon which to invoke an exception to the rule of issue preclusion.

### 2. *Taking*

█ Plaintiffs claim, as an alternative to their contract theories, that their property, in the form of the rental deposits, was taken by the United States for public use without just compensation in violation of the Fifth Amendment. Plaintiffs cite no authority—nor has the court found any—for the proposition that through the passage of time alone, a compensable taking may evolve out of the Government's holding of funds voluntarily placed in its hands under an agreement whose terms were clear from the outset.

The Opening Notice announcing the availability of the North Slope lands for noncompetitive leasing provided that "[u]pon the determination of the successful drawee for a particular block, the first year's rental * * * will not be returnable. However, if an offeror withdraws his offer to lease prior to the beginning of the drawing or if his offer is rejected, the advance rental will be returned to him." 31 Fed. Reg. 12575 (1966). Referring to this language, the district court found that "[b]y its own terms that provision is unrestricted as to the possible bases for rejection of an offer." *Rowe,* 464 F.Supp. at 1079. And on that same ground, the district court also

---

**6.** The district court, relying on *Schraier v. Hickel,* 419 F.2d 663 (1969), found that plaintiffs' interests, as lease applicants, could not "rise above an inchoate hope or expectation." *Rowe,* 464 F.Supp. at 1077. It was upon that underlying determination that the court based its conclusion that the Secretary's decision was proper.

upheld the decision of the Secretary, in which he had stated, "The noncompetitive oil and gas leasing regulations did not compel action on a lease offer within any particular time." *In Re Arctic Slope/Western,* ANCAB # RLS 76–11(A)–(MM); *In Re Arctic Slope/Western (Central),* ANCAB # RLS 7612(A)–(O), *quoted in,* 464 F.Supp. at 1084.

By submitting their entry cards and deposits, plaintiffs impliedly agreed to the terms set out in the notice. One such term was that the Government would retain possession of the deposit until a decision to accept or reject the lease offers was made. That, and no more, is what happened: the Government held plaintiffs' money until the rejection of their offers was final.

Significantly, there is no contention raised here that the Secretary unjustifiably delayed his decision on whether or not to accept plaintiffs' offers; hence, it is irrelevant that the Government rejected the requests for refunds which some of the plaintiffs had raised prior to the actual decision date. (Though similarly beside the point, we note in passing that other offerors had actually encouraged the Secretary to postpone a final acceptance determination—and thus the date the deposits would be returned—in the hope of ultimately obtaining a lease.)

In a recent decision of this court, the point was made that "an earnest money deposit implies by its purpose uncertainty as to whether there will be a contract at all and acceptance of the concomitant risk that one may lose the use of one's money." *City of Alexandria v. United States,* 3 Cl.Ct. 667, 680 (Cl.Ct.1983) (NETTESHEIM, J.). This observation appropriately demonstrates that plaintiffs have shown no facts which would support their claim to a taking.

### CONCLUSION

For the reasons stated, we grant defendant's cross-motion for summary judgment, both as to plaintiffs' contract claims and as to their taking claim. Accordingly, we deny plaintiffs' motion for partial summary

judgment and order that plaintiffs' first amended petition be dismissed with prejudice.